**Gary GRIMM and Grimm Brothers Realty Company, Plaintiffs,**

v.

**BOROUGH OF NORRISTOWN, Charles R. Sweeney and Thomas M. O'Donnell, Defendants.**

No. 01–CV–431.

United States District Court, E.D. Pennsylvania.

March 11, 2002.

608

612

Lloyd George Parry, Davis, Riter, Parry & Hartmann, Philadelphia, PA, for Plaintiffs.

David J. MacMain, Michael J. Butler, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, for Defendants.

1. We shall collectively refer to all plaintiffs and defendants as "plaintiffs" and "defendants," respectively.

2. We note that plaintiffs' complaint can be construed to contain a First Amendment retaliation claim, a Fourth Amendment unreasonable search and seizure claim, a Fourteenth Amendment procedural due process claim, a Fourteenth Amendment substantive due process claim, a Fourteenth Amendment equal protection claim, a claim for conspiracy under 42 U.S.C. § 1985, a state law unreasonable search and seizure claim, a claim for wrongful use of civil proceedings under 42 Pa.C.S. § 8315, and a claim for declaratory and injunctive relief challenging the validity of a warrant issued on November 30, 2000.

Several of these claims are, however, no longer before us. In their response, plaintiffs have clarified they are not advancing a procedural due process claim and are no longer pursuing their claim for declaratory and injunctive relief challenging the November 30, 2000 warrant. (Pls.' Answer to Defs.' Mot. to

## OPINION AND ORDER

VAN ANTWERPEN, District Judge.

### I. INTRODUCTION

Plaintiffs Gary Grimm ("Gary Grimm") and Grimm Brothers Realty Company ("Grimm Brothers") have brought this action pursuant to 42 U.S.C. § 1983. Plaintiffs allege that Defendants Borough of Norristown ("the Borough"), Charles R. Sweeney ("Sweeney") and Thomas M. O'Donnell ("O'Donnell") violated plaintiffs' rights under the First and Fourteenth Amendments of the United States Constitution.[1] They have also brought several pendent state law claims.[2] Plaintiffs also have a matter pending in the Court of Common Pleas of Montgomery County, Pennsylvania.

Presently before this Court are Plaintiffs' Motion for Partial Summary Judgment, filed on January 4, 2002, and Defendants' Motion for Summary Judgment, filed on January 4, 2002. Oral argument on these motions was held on February 13,

Dismiss at 10.) Plaintiffs' counsel also indicated at oral argument before this Court on February 13, 2002 that the thrust of plaintiffs' Section 1983 case is the First Amendment retaliation claim. However, plaintiffs did address their substantive due process claim in their Response to Defendants' Motion for Summary Judgment; thus, because it appears from their response that plaintiffs are still pursuing this claim and because this claim appears to bear a close connection to plaintiffs' retaliation claim, we will consider the substantive due process claim. We will not consider, and deem waived, the federal claims that plaintiffs have not addressed, including a Fourth Amendment unreasonable search and seizure claim and a Fourteenth Amendment equal protection claim.

We also consider plaintiffs' two state law claims insofar as they state a cause of action against defendants O'Donnell and Sweeney and not against the Borough. See Pls.' Answer to Defs.' Mot. to Dismiss at 11 (withdrawing the state law claims initially brought against the Borough).

2002. We have jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.

## II. STANDARD OF REVIEW

The court shall render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" only if it might affect the outcome of the suit under governing law. *Id.* at 248, 106 S.Ct. 2505, 91 L.Ed.2d 202. All inferences must be drawn, and all doubts resolved, in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir.1985), *cert. denied*, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985).

On motion for summary judgment, the moving party bears the initial burden of identifying those portions of the record that it believes demonstrate the absence of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the movant and may not rest on mere denials. *Id.* at 321 n. 3, 106 S.Ct. 2548, 91 L.Ed.2d 265 (quoting Fed. R.Civ.P. 56(e)); *see First Nat'l Bank of*

*Pennsylvania v. Lincoln Nat'l Life Ins. Co.*, 824 F.2d 277, 282 (3d Cir.1987). The non-moving party must demonstrate the existence of evidence that would support a jury finding in its favor. *See Anderson*, 477 U.S. at 248–49, 106 S.Ct. at 2505.

Where the parties submit cross-motions for summary judgment[3], the court must consider the merits of each motion and, for each, view all evidence in the light most favorable to the non-moving party, draw all reasonable inferences in favor of the non-movant and, where the evidence cited contradicts that invoked by the moving party, take the non-moving party's version as true; the standard of review does not change merely because the parties have filed cross-motions for summary judgment. *Gavigan v. The Southland Corp.*, No. Civ.A. 97–2807, 1998 WL 103380, at *1 (E.D.Pa. Feb. 25, 1998). The fact that the parties file cross-motions for summary judgment does not require the court to grant summary judgment for either party; courts will sometimes find that both motions must be denied. *See id.* On the other hand, where the facts are largely uncontested and the issues are legal ones, the court itself may resolve the issues.

## III. FACTUAL BACKGROUND

### A. The Parties

Gary Grimm is the president and sole officer of Grimm Brothers, a company that owns and rents several properties in the Borough.[4] Three of Grimm Brothers' properties, located at 857 Cherry Street, 837 Swede Street and 839 Swede Street, are the subject of this suit and the motions

---

**3.** Plaintiffs have moved for partial summary judgment with respect to one of the incidents that is the subject of their retaliation and substantive due process claims. Defendants have moved for summary judgment on all of plaintiffs' claims.

**4.** Gary Grimm's brother, Kevin Grimm, not a party to this action, is the sole shareholder of the corporation. Plaintiff Gary Grimm solely operates Grimm Brothers.

before this Court. The properties are located near to one another.

Since 1997 Gary Grimm has been involved with the Norristown Association of Investment Landlords ("NAIL"), first as a member and, for the past four years, as NAIL's Director of Public Relations. In 1994, 1995 and 1997, plaintiffs and other NAIL members filed lawsuits that challenged licensing fees imposed by the Borough. The various lawsuits were settled simultaneously in November of 1999. Gary Grimm is also a member of the Norristown Initiative ("NI"), an organization created by the Montgomery County Commissioners; Gary Grimm served as Chairman of NI's Code Enforcement Committee. In his capacity as a NAIL Director and as an NI Chairman and through the filing of lawsuits against the Borough, Grimm has interacted with Borough officials, including defendants O'Donnell, an Assistant Building Inspector for the Borough of Norristown, and Sweeney, the Borough of Norristown's Fire Marshal.

### B. *Factual Overview*

Beginning in March of 2000, defendants O'Donnell and Sweeney issued condemnation notices and several citations against Gary Grimm and Grimm Brothers because of alleged building code violations on Grimm Brothers' properties. Plaintiffs allege that O'Donnell and Sweeney took these actions in retaliation against Gary Grimm and Grimm Brothers for their participation in NAIL and NI and for their filing of lawsuits against the Borough and Borough officials. The facts pertaining to each of the citations are recounted herein.

### C. *837 Swede Street*

On or about March 7, 2000, there was a fire at plaintiffs' 837 Swede Street four-unit apartment house which required the response of the fire department. According to plaintiffs, the fire was confined to the apartment in which the fire started; smoke damage extended to the building's common areas and water from the firefighting effort affected the first floor and the basement walls near the electrical panel. According to defendants, the fire was "substantial." On March 7, 2000, Sweeney notified Gary Grimm by letter that "[t]he fire heavily damaged the structural elements of [the] apartment with light to moderate smoke conditions throughout the second and third floor apartments" and that water that was used to extinguish the fire traveled "down through the walls and floors of the structure damaging the main electrical service that provides electricity to the entire building." It stated that "[d]ue to the damages caused by the fire we have deemed the entire building at 837 Swede Street unsafe and unfit for human habitation and have condemned the property." The condemnation was made pursuant to The BOCA National Existing Structures Code ("BOCA Code"), promulgated by the Building Officials and Code Administrators International, Inc.' ("BOCA") and corresponding Borough ordinances.[5]

On the same day, plaintiffs had Gambino Electric, an electrical contractor certified by the Borough, inspect the property. Gambino Electric concluded that excluding the office space used by Grimm Brothers and the apartment in which the fire had started, the building's electrical system could be safely operated. Gambino Electric gave plaintiffs a written certification of its findings, and plaintiffs provided this certification to the Borough. The Borough did not however rescind the condemnation,

---

**5.** The condemnation was made pursuant to Borough Ordinance 87–10 of the BOCA Existing Structures Code, sections ES–106.1.1, ES–106.1.3 under emergency order ES–109.0.

and the tenants were not allowed to return to their apartments. Plaintiffs then employed the services of Middle Department Inspection Agency, Inc. in another effort to have the condemnation rescinded. Middle Department, Inc.'s March 9, 2000 evaluation was that the electrical wiring met the standards of the National Electric Code and plaintiffs notified defendants of this. The Borough again did not rescind the condemnation.

Sweeney wrote to plaintiffs on March 13, 2000, notifying them of the conditions that would have to be corrected before the condemnation would be lifted. These conditions included: (1) providing a certificate from an electrical underwriter that they electrical system was safe; (2) ensuring that no more than three unrelated persons were not living within one unit; (3) allowing for an inspection to ensure that all damaged doors and windows had been repaired and that all fire extinguishers and smoke detectors were operational; (4) clearing the basement of all combustible and flammable materials and ceasing all warehouse-storage-shop operations in the basement or separating the basement-warehouse-storage-shop area from the first floor offices and rental units with a fire separation and (5) providing a current list of businesses operating out of the first floor, with the name of the responsible party and his/her phone number.

With respect to these conditions, plaintiffs contend that (1) they had already provided a certificate from an electrical underwriter to Sweeney; (2) the number of individuals residing in the apartment in question did not exceed the maximum number allowed by law; (3) the doors, windows, fire extinguishers and smoke detectors were repaired within a week of the fire; (4) the combustibles and flammables were eventually removed even though the code did not require their removal and the fire rated ceiling was not installed because

the code did not require such installation; and (5) Gary Grimm advised the Borough that it could contact all businesses through him and that he was not required to supply a list of all businesses operating out of the first floor.

From March through April, 2000, Gary Grimm and Sweeney continued to exchange correspondence. Gary Grimm alleges that Borough officials repeatedly imposed new conditions that would have to be met before the condemnation would be rescinded, including the installation of a fire suppression system in the basement.

On April 19, 2000, when Sweeney and Lynn Bixler, the Borough's Building Inspector, arrived at the appointment to inspect the premises, Gary Grimm and others were on the premises. According to Gary Grimm, workers were there salvaging business records and making repairs to the areas damaged by the fire; defendants dispute this. On April 19, 2000, Sweeney issued a citation to Gary Grimm for "occupying a condemned building" and in his deposition mentioned that workers were not allowed on the premises without a permit from the Borough. Plaintiffs point out, however, that no such permit is available under the Borough code. A state court found Gary Grimm not guilty of the April 19 offense.

On April 30, 2000, Sweeney observed Gary Grimm entering the condemned building and cited Gary Grimm for being "found within a condemned building." Plaintiffs note that Gary Grimm had previously obtained Borough permits to make repairs to the premises. They highlight that Sweeney issued the citation without first investigating why Gary Grimm was on the premises and whether he was there lawfully. A state court also found Gary Grimm not guilty of the April 30 offense.

Plaintiffs initiated proceedings in the Court of Common Pleas of Montgomery

County, Pennsylvania to have the condemnation rescinded. According to plaintiffs, on or about August 30, 2000, counsel for the Borough agreed in chambers before the court that the condemnation would be rescinded immediately. Plaintiffs contend that, relying on that representation, they scheduled an NI meeting to be held at 837 Swede Street on September 20, 2000. O'Donnell observed two persons entering the 837 Swede Street premises on the evening of September 20, 2000. He contacted the Borough police, who entered the property and disbanded the meeting. O'Donnell also issued a citation to Gary Grimm for occupying a condemned building. A state court dismissed the September 20 citation.

The 837 Swede Street apartment remains condemned, and the tenants cannot occupy it.

### D. *839 Swede Street*

On July 12, 2000, O'Donnell mailed a warning to Grimm Brothers giving it 48 hours from the date of the warning to remove the weeds from the front of the 839 Swede Street apartment. Gary Grimm claims that he did not receive the warning until July 17, 2000. At that time, he cut the growth and notified O'Donnell of this by fax. On July 17, 2000, O'Donnell issued a citation against Grimm Brothers for not cutting the growth within the allotted time.

Defendants emphasize that O'Donnell sent similar warnings to thirty-eight other property owners at the same time, and that he cited six to ten property owners for the failure to cut the weeds within 48 hours. Plaintiffs point out that the notice allowed for only 48 hours from the date that the warning was written to comply and suggest that because the warning was mailed, this request could not possibly have been met. A state court also dismissed O'Donnell's weed cutting citation.

### E. *857 Cherry Street*

### 1. *Facts Involving Condemnation of Basement of 857 Cherry Street*

On June 14, 2000, Matthew Wakefield ("Wakefield"), a tenant in the basement of plaintiffs' 857 Cherry Street apartment, wrote a letter to Gary Grimm requesting that certain repairs be made and declaring that he would not pay his July rent until his requests were met. Mr. Wakefield then lodged a formal complaint with the Borough Building Inspector's office. Wakefield allowed O'Donnell to inspect the basement. On August 10, 2000, O'Donnell issued a citation to Grimm Brothers for failing to obtain a use and occupancy certificate when the basement tenancy changed. Plaintiffs contend that no use and occupancy certificate was required by law. A state magistrate found Grimm Brothers guilty of this offense; the matter is currently on appeal with the Court of Common Pleas of Montgomery County, Pennsylvania.

O'Donnell also notified plaintiffs by letter dated August 10, 2000 that he was condemning the basement of 857 Cherry Street. The reasons for the condemnation included: (1) there was no zoning for a second business in the basement; (2) plaintiffs had not obtained the necessary use and occupancy certificate; (3) the basement lacked sanitary facilities; (4) there was a sewage back-up; (5) the basement lacked an approved fire-rated assembly to separate tenant spaces; (6) the ingress and egress doors were padlocked and (7) the interior had been altered without approval.

Plaintiffs point out that at this time, they learned that complainant Wakefield was using the basement to restore antique cars and to store lawnmowers and that they were engaged in a dispute with him because this conduct violated the terms of his lease. With respect to each of the

conditions, plaintiffs maintain that: (1) the property was properly zoned; (2) the use and occupancy certificate was not required; (3) Wakefield had broken the toilet; (4) there was no sewage back-up; (5) the fire-rated separation was not required by law; (6) Wakefield had attached the padlocks and plaintiffs had thereafter removed them and (7) the basement alterations were made at Sweeney's direction.

### 2. *Facts Involving Apartment Units Located at 857 Cherry Street*

On August 14, 2000, O'Donnell conducted an annual inspection of the apartment units located at 857 Cherry Street. O'Donnell noticed several violations of the BOCA code and ordered that defendants (1) inspect the fire extinguisher at the side exit to the fire escape; (2) move the trash from the hallway; (3) check all smoke detectors to ensure their proper operation; (4) inspect and maintain all fire extinguishers for the calendar year and (5) install screens in windows. O'Donnell ordered that these conditions be met within thirty days and scheduled a re-inspection for Sept. 14, 2000. According to defendants, this notice was handed to plaintiffs' agent or mailed to Gary Grimm. Gary Grimm did not appear at the scheduled inspection, but sent a fax on September 17, 2000 apologizing for missing the appointment and indicating that he did not have notice of the appointment. Defendants claim that Gary Grimm failed to appear for the inspection again on September 26, 2000. On September 26, 2000, O'Donnell sent a letter rescheduling the inspection appointment for October 10, 2000. The letter indicated that if Gary Grimm failed to appear at the appointment, he would be cited for non-compliance. By letter to O'Donnell on October 5, 2000, Gary Grimm explained that he had no notice of the September 14, 2000 scheduled inspection. Gary Grimm also stated that one of Grimm Brothers' employees had met O'Donnell at the property on September 26, 2000 and had provided access to the basement to him. In this letter, Gary Grimm stated that he believed he was "a target of the Borough" and "den[ied] any further access by Borough employees into any of [his] properties."

Defendants point out that the inspection of the basement was a matter separate from the inspection of the apartments: "[a]lthough Mr. Grimm contends that he made the *basement* available to Mr. O'Donnell for inspection on September 26, 2000, Mr. O'Donnell sought to inspect the apartment complex itself and not just the basement to make sure the code violations had been remedied." (Defs.' Opp. Brief to Pls.' Mot. for Partial Sum. Judg. at 2 fn. 2.)

Plaintiffs did not appear for the October 10, 2000 inspection. On October 11, 2000, O'Donnell issued a citation to Grimm Brothers for "refus[ing] free access to the building to conduct proper inspections by Borough Code officials." Plaintiffs point out that under the BOCA code and Borough ordinances, O'Donnell was not authorized to issue a citation for the refusal of access; he should have instead sought a cease and desist order or a search warrant to conduct the inspection.

On October 11, 2000, O'Donnell obtained a court-issued search warrant to inspect 857 Cherry Street; this warrant authorized the inspection of the entire building and allowed the inspection for the purpose of determining whether the violations found during the August 14, 2000 inspection had been corrected. O'Donnell inspected the building and on October 11, 2000 also issued a citation to Grimm Brothers for failing to correct "all building, safety, fire and electrical violations in the time specified by the Code official." Grimm Brothers was found guilty of this latter violation.

On August 25, 2000, O'Donnell also issued a citation to Grimm Brothers for permitting workers to enter the condemned 857 Cherry Street property. Plaintiffs point out that they had submitted a list of proposed repairs to O'Donnell in advance and had sent a fax requesting permission to go onto the premises to make the listed repairs. Defendants claim that the citation was issued because plaintiffs had not obtained and completed a permission slip from the Borough. The Borough withdrew this citation in November of 2000.

Thereafter, on September 7, 2000, O'Donnell requested a permission slip; O'Donnell responded that before he could issue a permission slip, plaintiffs would have to specify the repairs to be made and obtain the necessary permits. On September 8, and 9, 2000, plaintiffs faxed O'Donnell, explaining that they wished to make general repairs that did not require a permit. O'Donnell explained that this request was not sufficient because plaintiffs had not filled out a Borough form requesting a permission slip. The basement of 857 Cherry Street remained condemned until November 2, 2000.

### F. Factual Summary

From March of 2000 through October of 2000, defendants issued two condemnation notices and eight citations against Gary Grimm and Grimm Brothers that are at issue here. Two citations resulted in not guilty verdicts; two of the citations were dismissed by the state court, one was withdrawn, and two others have resulted in guilty verdicts and are currently on appeal in the state court system.[6] Plaintiff contend that defendants issued the condemnation actions and all of the citations in retaliation for plaintiffs' exercise of constitutionally protected activities in violation of federal and state law.

## IV. DISCUSSION

### A. Jurisdictional Issues

There are several threshold jurisdictional issues for decision.

### 1. Rooker–Feldman Doctrine

At oral argument on the parties' motions for summary judgment, this Court noted the existence of a state court action and raised the question of whether the Rooker–Feldman doctrine deprives this Court of subject matter jurisdiction over this case. The parties have since submitted supplemental briefs on this issue, and we thank them for doing so.

### a. Rooker–Feldman Principles

██ Section 1257 of Title 28 of the United States Code provides that "[f]inal judgments or decrees rendered by the highest court of a state in which a decision could be had, may be reviewed by the Supreme Court...." The negative implication of this rule, as set forth in Rooker v. Fidelity Trust Co., 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1983) and District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983), is that lower federal courts lack subject matter jurisdiction to review final judgments of the highest court of the respective states. E.B. v. Verniero, 119 F.3d 1077, 1090 (3d Cir.1997). The Third Circuit has interpreted the Rooker–Feldman doctrine to encompass final decisions of lower state courts as well. Id.

██ "The Rooker–Feldman doctrine forecloses not only straightforward appeals

---

**6.** The status of the October 11, 2000 citation for the refusal of access is unclear from the record.

but also more indirect attempts by federal plaintiffs to undermine state court decisions." *Newell v. Rolling Hills Apartments,* 134 F.Supp.2d 1026, 1033 (N.D.Iowa 2001). Indeed, federal district courts also lack jurisdiction over any constitutional claims that are "inextricably intertwined" with specific claims already adjudicated in state court. *Feldman,* 460 U.S. at 482 n. 16, 103 S.Ct. 1303. As the Third Circuit recently explained:

> When a plaintiff seeks to litigate a claim in a federal court, the existence of a state court judgment in another case bars the federal proceeding under *Rooker–Feldman* only when entertaining the federal claim would be the equivalent of an appellate review of that order. For that reason, *Rooker–Feldman* applies only when in order to grant the federal plaintiff the relief sought, the federal court must determine that the state court judgment was erroneously entered or must take action that would render the judgment ineffectual.
>
> *FOCUS v. Allegheny County Court of Common Pleas,* 75 F.3d 834, 840 (3d Cir.1992) (citations omitted).

#### b. *Defendants' Position as to Applicability of Rooker–Feldman*

Defendants assert that the *Rooker–Feldman* doctrine bars this Court from adjudicating plaintiffs' constitutional claims. They point out that plaintiffs have made three motions in the state court action to have the condemnation of 837 Swede Street lifted, and that the state court, after a full hearing on each of the motions, has denied all three motions. They argue that if this Court were to find that defendants issued the condemnation, and kept it in place, out of retaliatory motives, it would have to find that there was no merit to the condemnation and, thus, would have to overrule the state court's decisions. Defendants contend that plaintiffs raised the retaliation issue before the state court, and that the state court rejected plaintiffs' allegation of retaliation; according to defendants, to find in plaintiffs' favor on the retaliation claim would require a determination that the state court's decision was erroneous. Alternatively, defendants suggest that the retaliation claim is inextricably intertwined with the decision to condemn the property and the refusal to lift the condemnation; they suggest that in order to find that defendants retaliated, there must be a finding that the condemnation was not proper.

#### c. *Plaintiffs' Position as to Applicability of Rooker–Feldman*

Plaintiffs, on the other hand, argue that application of the *Rooker–Feldman* doctrine is inappropriate. They assert that there was no final adjudication that would warrant the application of *Rooker–Feldman.* They point out that the case has not proceeded to trial and assert that none of the motions or corresponding court orders resolved the constitutional issues presently before this Court. Additionally, they point to two additional bars to the application of the doctrine. First, application of this jurisdictional bar is inappropriate because Gary Grimm is not a party to the state court action. Second, because the condemnation case filed in state court concerns only the condemnation of 837 Swede Street, and not the condemnation of the basement of 857 Cherry Street or the citations issued against Gary Grimm and Grimm Brothers, application of the jurisdictional bar is inappropriate.

#### d. *Applicability of Rooker–Feldman Doctrine*

■ As a preliminary matter, we agree with plaintiffs that the *Rooker–Feldman* doctrine does not bar this Court from hearing Gary Grimm's claims because he is

not a party to the state court proceeding. *See Marks v. Stinson,* 19 F.3d 873, 885 (3d Cir.1994) (holding that *Rooker–Feldman* did not bar district court from hearing claims of Latino plaintiffs who were not parties to the state court proceedings). Second, we agree that the application of the *Rooker–Feldman* doctrine would be limited to that which is the subject of the state court proceeding-that is, the condemnation of 837 Swede Street and any of the citations pertaining thereto that may have been challenged in the state court.

■ Turning to whether the *Rooker–Feldman* doctrine bars this Court from hearing the constitutional claims arising from that which is also the subject of the state court proceedings, we first note that the state case has not proceeded to trial, and that the only orders that the state court has entered are denials of three motions for a preliminary injunction and/or a temporary restraining order filed in an attempt to allow the tenants to re-occupy the property. We consider then whether the denial of a motion for a preliminary injunction is the type of adjudication that calls the *Rooker–Feldman* doctrine into play. The Third Circuit has stated that an order denying a motion for a preliminary injunction may trigger the application of the *Rooker–Feldman* doctrine. *See Port Auth. Police Benevolent Assoc. v. Port Auth. of New York and New Jersey Police Dept.,* 973 F.2d 169 (3d Cir.1992); *Wishnefsky v. Addy,* 969 F.Supp. 953, 956 (E.D.Pa.1997); *but see Perlberger v. Perlberger,* No. CIV.A. 97–4105, 1998 WL 472657, at *3 (E.D.Pa. Aug. 13, 1998) ("*Rooker–Feldman* does not apply to interlocutory orders that, by definition, are provisional and not final.")

In *Port Authority,* a New York state court entered a preliminary injunction prohibiting non-profit organizations of New York Port Authority police officers from soliciting contributions from Port Authority tenants; the prohibition was based on a Port Authority regulation. The non-profit organization then filed a federal complaint seeking a temporary restraining order and an injunction that would prohibit the Port Authority from enforcing its regulation prohibiting employee solicitations. The Court of Appeals held that the district court properly dismissed the federal complaint under the abstention doctrine developed in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). The district court recognized that an injunction against the Port Authority would, if granted, effectively enjoin the enforcement of the New York state court's order and unnecessarily interfere with New York's substantial interest in enforcing the state court order; accordingly, the court declined to exercise jurisdiction. The federal plaintiffs attempted to distinguish the case from precedent, on the grounds that previous cases involved a challenge to the enforcement of a final judgment of a state court, whereas their case involved a preliminary injunction, which was interlocutory in nature. The Court of Appeals concluded that the fact that the order was interlocutory, rather than final, in nature did not preclude abstention. Abstaining in the case of an interlocutory order, just as in the case of a final order, is often necessary to preserve the principles of comity and federalism that underlie abstention. Although the court decided the case under *Younger,* the court declared that it would have reached the same conclusion under *Rooker–Feldman.* The court explained that abstention is justified under both doctrines because the state has an important interest in enforcing orders issued by its state courts-regardless of whether they are final or interlocutory in nature.

More important to the court's analysis than whether the order was final or interlocutory was the fact that the state court order resolved the federal question that

was presented to the federal court by the same parties and whether the federal question was one that could be adequately addressed by the state court. Speaking to the *Rooker–Feldman* doctrine, the court stated:

> [a]s discussed ... in the context of *Younger* abstention, the preliminary injunction issued by the New York trial court against the [federal plaintiffs] resolved, at least for the moment, the dispute between the parties which forms the basis of the federal complaint at issue in this case.

*Port Auth. Police Benevolent Assoc., Inc.,* 973 F.2d at 178.

Indeed, the parties presented the same constitutional argument against the enforcement of the Port Authority regulation in state court as they did in federal court, and "[t]his constitutional argument [sought to be presented in federal court] ... was resolved in by the New York state court in its order granting a preliminary injunction to the Port Authority" and the very issue was on appeal in the state system. *Id.,* 973 F.2d at 173.

We find that abstention under *Rooker–Feldman* is not appropriate in the case before us. First, we note that *Port Authority* explicitly states that "we ... do not hold that federal courts must abstain in every case involving a constitutional challenge to a state court interlocutory order." *Id.,* 973 F.2d at 174–75. Most important to our analysis is that, unlike in *Port Authority,* here there is no indication here that the state court decided the constitutional issues presented to this Court. Indeed, in state court plaintiffs sought an order that would permit the tenants to re-occupy the premises. Plaintiffs are not seeking from this federal court an order that would require that the condemnation be lifted and that the tenants be allowed to re-occupy the building. Rather, they allege that the defendants' conduct in con-

demning the building, and in issuing other citations that are not the basis of the state court action, constitute unlawful retaliation. Although defendants argue that plaintiffs mentioned retaliation in their third Motion for Preliminary Injunction and in their Response to Defendants' Motion for Entry upon Land, there is no evidence that the state court decided the constitutional retaliation issue. There can be many reasons for denying an injunction. We have no written opinion before us and we can infer from the fact that the state court did not halt the condemnation at most the conclusion that the state court believed that grounds for halting the condemnation were not established; we cannot infer from this that the court took the additional step and decided that defendants had not engaged in retaliation. *See Ernst v. Child and Youth Servs. of Chester County,* 108 F.3d 486, 492 (3d Cir.1997) (finding that district court's deciding the substantive due process claims did not involve federal court review of state court decision in dependency proceeding because although plaintiff mentioned her concerns of bias during state court proceeding, plaintiff did not articulate her concerns in constitutional due process terms and substantive due process claims were never decided by state court).

Stated differently, the state court judgment is not "inextricably intertwined" with the federal claims. Declining to abstain under *Rooker–Feldman* and exercising our jurisdiction does not require that we determine that the state court judgment was erroneously entered or that we issue a decision that would render the state court's order ineffectual. Simply put, it is fully possible that the state court's decision is correct yet the defendants' actions are nonetheless retaliatory. Indeed, retaliation may be shown without a finding that the condemnation was baseless and, thus, without what would in essence be a rever-

sal of the state court's order; for example, plaintiffs may present evidence that other property owners were not subject to the same treatment as evidence of retaliation or may point to defendants' course of conduct as a whole, including issuing numerous citations, to show retaliation. *See Ernst*, 108 F.3d at 491–92 ("The *Rooker–Feldman* doctrine did not preclude the district court from deciding those claims because a ruling that the defendants violated [plaintiff's] right to substantive due process by making recommendations to the state court out of malice or personal bias would not have required the court to find that the state court judgments made on the basis of those recommendations were erroneous.")

### 2. *Younger Abstention*

Defendants have incorporated in their brief on *Rooker–Feldman* the *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) abstention argument that they first raised in their Motion to Dismiss. We now address the applicability of *Younger*.

#### a. *Younger Principles*

In *Younger*, a state criminal defendant filed a federal action that alleged that the statute underlying his state prosecution violated the Constitution; he requested that its enforcement be enjoined. He thereby sought to reframe the issues in federal court and to convert what would ordinarily be a defense to a criminal prosecution into an affirmative claim for relief. *See Special Souvenirs, Inc. v. Town of Wayne*, 56 F.Supp.2d 1062, 1071 (E.D.Wis. 1999). The Court concluded that absent extraordinary circumstances, the federal court should abstain from hearing the case based on principles of equity, comity and federalism. *Younger*, 401 U.S. at 43–50, 91 S.Ct. 746. *Younger*'s holding has since been expanded to apply (1) to cases involving civil enforcement proceedings in state

court rather than criminal prosecutions, *see Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); (2) to cases involving the integrity of administration of the state's judicial system, *see Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977); (3) in cases involving two private parties, *see Pennzoil Co. v. Texaco Inc.*, 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987) and (4) in light of certain pending administrative proceedings, *see Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986) and *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982).

■ Federal courts determining that abstention is appropriate under *Younger* must find that: (1) the state action constitutes an ongoing judicial proceeding; (2) the proceedings implicate important state interests and (3) there is an adequate opportunity to raise the constitutional challenges in the state proceedings. *Middlesex County*, 457 U.S. at 432, 102 S.Ct. 2515.

■ "As a threshold condition to the above requirements, *Younger* applies only when the relief the plaintiff seeks in federal court would interfere with the ongoing state judicial proceeding." *Columbia Basin Apartment Assoc. v. City of Pasco*, 268 F.3d 791 (9th Cir.2001); *see also Marks v. Stinson*, 19 F.3d 873, 882 (3d Cir.1994) ("A federal court will only consider *Younger* abstention when the requested equitable relief would constitute federal interference in state judicial or quasi-judicial proceedings.") (citations omitted); *Am. Fed'n of State, County and Municipal Employees v. Tristano*, 898 F.2d 1302 (7th Cir.1990) (noting that common thread in cases implicating *Younger* abstention is the impact on and interference with the state proceedings); *Volpi v. City of Chicago*, Civ.A. No.

95 C 4188, 1995 WL 491493, at *2 (E.D.Pa. Aug. 1, 1995) (finding *Younger* abstention inappropriate in part because defendants had failed to demonstrate how the federal proceedings would interfere with the state court proceedings). This is because "[w]here federal proceedings parallel but do not interfere with the state proceedings, the principles of comity underlying *Younger* abstention are not implicated." *Gwynedd Properties, Inc. v. Lower Gwynedd Township*, 970 F.2d 1195, 1201 (3d Cir.1992). "The federal court interferes with state court proceedings if plaintiffs seek relief in federal courts which will impair the ability of the state courts to adjudicate anything that is currently before them or where federal relief would render the state court's orders or judgments nugatory." *Rappaport v. Norlar, Inc.*, Civ.A. No. 93–4756, 1994 WL 167959, at *9 (E.D.Pa. April 29, 1994) (internal quotations and citations omitted). If these conditions are met, abstention is proper unless the plaintiff meets the heavy burden of showing "bad faith, harassment, or some extraordinary circumstance that would make abstention appropriate." *Id.* at 435, 102 S.Ct. 2515; *see also Trackwell v. Kansas*, 2001 WL 709366, at *2 (D.Kan. May 10, 2001).

### b. *Defendants' Position as to Applicability of Younger*

 Defendants argue that this Court should abstain under *Younger.* Defendants submit that there is a judicial proceeding ongoing in the Court of Common Pleas of Montgomery County wherein plaintiffs can raise their constitutional challenges. They contend that zoning and land use decisions implicate important state interests that are outside the general supervising power of federal courts.

### c. *Plaintiffs' Position as to Applicability of Younger*

Plaintiffs respond that

the instant federal complaint in no way offends the federal/state comity which underlies *Younger* abstention because it (a) challenges the defendants' willful and malicious misconduct without implicating the legality of the Borough's building code or ordinances under which they acted, (b) does not seek to enjoin or interfere with the case in common pleas court, (c) challenges the entire course of defendants' illegal conduct in relation to properties other than 837 Swede Street which is the subject of the proceeding in common pleas court, and (d) unlike the common pleas complaint, sues Defendants Sweeney and O'Donnell in their individual as well as their official capacities.

(Pls.' Answer to Defs.' Mot. to Dismiss at 8.)

### d. *Applicability of Younger*

Applying the principles of *Younger* to the present case, we first note that this is not the typical *Younger* case. Usually, *Younger* abstention applies in cases where the state court defendant is the federal court plaintiff. *See Crawley v. Hamilton County Comm'rs*, 744 F.2d 28, 30 (6th Cir.1984) ("In the typical *Younger* case, the federal plaintiff is a defendant in ongoing or threatened state court proceedings seeking to enjoin continuation of those proceedings.") Here, the same plaintiff is bringing both the state court and federal court cases.[7] Nevertheless, we also recognize that in this context, formal denominations of plaintiff and defendant should not be applied mechanically. *See, e.g., Fresh Int'l Corp. v. Agric. Labor Relations Bd.*, 805 F.2d 1353, 1360 n. 8 (9th Cir.1986)

---

**7.** That is, Grimm Brothers is a plaintiff in both the state and federal court actions.

(abstaining under *Younger* despite the fact that *Younger* abstention ordinarily does not apply where, as in the case before the court, a federal plaintiff also is the plaintiff in state court). Rather, what is significant is the purpose behind the proceedings and the impact that the federal court's hearing the proceedings will have on state-federal relations. If the principles of comity and federalism are implicated, abstention may be appropriate even in the atypical *Younger* context (where the same plaintiff brings both the state court and federal court actions). Indeed, in most cases stating that the procedural posture counsels against abstaining under *Younger*, the determinative factor is not necessarily the procedural posture in itself, but rather the relief sought and its implications for federalism.[8]

One such case is *Kentucky West Virginia Gas Company v. Pennsylvania Public Utility Commission*, 791 F.2d 1111 (3d Cir.1986). There, the Public Utilities Commission issued orders governing retail natural gas rates against two gas companies. One of the companies filed a Petition for Review in the Commonwealth Court of Pennsylvania. Thereafter, both companies filed suit against the Commission in federal district court, seeking declaratory and injunctive relief. The district court dismissed the action, finding abstention appropriate. The Court of Appeals for the Third Circuit held that abstention under *Younger* was not appropriate. The court stated that the procedural posture of the case, with the identity of the state and federal court plaintiffs being the same, dictated that abstention was not appropriate, and held that the district court abused its discretion in abstaining. *Kentucky West Virginia*, 791 F.2d at 1117. More importantly to the decision, however, was the fact that the parties "[were] not seeking to enjoin any state judicial proceeding; instead, they simply desire[d] to litigate what [was] admittedly a federal question in court." *Id.* The court concluded that "under the circumstances, . . . the balance of state and federal interests tip[ped] decid-

---

**8.** We note the presence of one case, *Hotel and Restaurant Employees and Bartenders International Union Local 54 v. Read*, 597 F.Supp. 1431 (D.N.J.1984), which interprets Third Circuit case law to require that the state have initiated the proceedings sought to be enjoined before *Younger* can apply. We decline to apply the state-initiation rule discussed therein here. We note that since *Hotel and Restaurant Employees* was decided, the courts have expanded *Younger* even further. Indeed, the United States Supreme Court has held *Younger* abstention to be applicable in a case involving two civil parties, where the state was not a party to the action at all. *See Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987) (holding that *Younger* abstention required district court to abstain from hearing claims of company against which sizeable jury verdict had been awarded that state proceedings violated company's rights and from hearing company's claim for injunction against enforcement of the judgment). Such a mechanical rule like the state-initiation rule does not account for situations like the situation in *Pennzoil* in which the state is not a party to the action, but where the principles of federalism and comity nonetheless counsel in favor of abstention. Not only does such a rule not account for this situation in which the state is not a party to the action at all, but it also does not cover the situation in which the state is a party but does not, as a formal matter, initiate the state judicial proceeding (i.e., the state does not file the state court complaint), but does take some action that then propels the party against whom the action was taken to file suit against the state entity. In such a situation, regardless of whether the state formally initiated the court proceedings, abstention may be warranted under *Younger*; plaintiffs should not be able to escape *Younger*'s reach solely because of the fact that it, and not the state, initiated the state proceedings. For more discussion on this point, *see, e.g., Fresh Int'l Corp. v. Agric. Labor Relations Bd.*, 805 F.2d 1353, 1360 n. 8 (9th Cir.1986) (discussed *supra* at IV.A.2.d.).

edly away from abstention under *Younger*." *Id.*

Similarly, in *Crawley v. Hamilton County Commissioners*, 744 F.2d 28 (6th Cir. 1984), where prison inmates filed suit first in state and then in federal court challenging the conditions of their confinement, the court noted that the case before the court, where the federal plaintiffs were also the plaintiffs in state court, had a very different procedural posture than *Younger* and its progeny. *See Crawley*, 744 F.2d at 30. The court noted that "[i]n addition, the plaintiffs [were] not attempting to use the federal courts to shield them from state court enforcement actions" and accordingly held that "there [was] no basis for *Younger* abstention." *Id.* We proceed with these principles in mind.

We find that the threshold *Younger* requirement is not met here. There has been no showing that these federal proceedings will interfere with the proceedings ongoing in the Montgomery County Court of Common Pleas. Plaintiffs do not directly challenge the constitutionality of any ordinance, and do not seek to enjoin the state court proceedings. Rather, plaintiffs allege that defendants' actions in condemning several of plaintiffs' properties and in issuing multiple citations against plaintiffs constitute unlawful retaliation and a violation of their substantive due process rights, and seek money damages for these alleged constitutional violations. The relief that plaintiffs seek, if granted,

would not impair the state court's ability to adjudicate the matters before it; nor would such relief render the state court's orders or judgments nugatory. Indeed, contrary to defendants' assertions [9], it would be possible for the state court to find the condemnation proper and yet there to be a federal finding of retaliation. Nor would, as defendants suggest [10], a finding in plaintiffs' favor disrupt the function of the local government. Plaintiffs are challenging the defendants' entire course of conduct and the application of various ordinances in this instance. A finding in this case that defendants' issuance of condemnation notices and citations constitutes improper retaliatory action would not disrupt unconnected, future zoning decisions.

Undoubtedly, case before this Court involves some of the same factual circumstances that underlying the state court action.[11] Nevertheless, "[w]here federal proceedings parallel but do not interfere with the state proceedings, the principles of comity underlying *Younger* abstention are not implicated" and *Younger* abstention is not warranted. *Gwynedd Properties, Inc. v. Lower Gwynedd Township*, 970 F.2d 1195, 1201 (3d Cir.1992). Having found that the threshold condition for *Younger* abstention is not met, we need not address the remaining three requirements for *Younger* abstention.[12] As in *Kentucky West Virginia* and *Crawley*, not

---

**9.** Defendants contend that "[i]f the Court of Common Pleas finds that a condemnation was appropriate, the Plaintiffs do not have a constitutional claim of retaliation." (Defs.' Mot. to Dismiss at 7.)

**10.** Defendants assert that "if this Court were to interpret Norristown's zoning ordinance in manner [sic] consistent with Plaintiffs' interpretation, such an interpretation would be disruptive of the zoning function of Norristown's local government." (Defs.' Mot. to Dismiss at 7.)

**11.** We reiterate, though, that plaintiffs also challenge additional conduct by defendants (another condemnation and multiple citations against plaintiffs) that is not the basis of the state court action.

**12.** We note that aside from making the conclusory statement that a federal decision would disrupt local government functions, defendants do not address the threshold interference requirement in their Motion to Dismiss.

only does the procedural posture of this case counsel against *Younger* abstention, but more importantly, the fact that the federal proceedings do not impact state-federal relations indicates that *Younger* abstention is inappropriate.

This case mirrors *Gwynedd Properties, Inc. v. Lower Gwynedd Township*, 970 F.2d 1195 (3d Cir.1992). In *Gwynedd*, a real estate developer alleged that the township and members of the board of supervisors arbitrarily, maliciously, capriciously and for their own interests rejected its development plans for several parcels of land. There were several state court proceedings regarding the land. The developer then filed a federal court action alleging that the defendants acted in concert to prevent it from making full legal use of the property and to reduce the value of the property and therefore the price that the township would have to pay were it to acquire it through condemnation proceedings. The developer alleged that it was entitled to relief under Section 1983 on the ground that the defendants denied it its due process rights and the right to be free from unreasonable searches, and asked for injunctive and monetary relief.

The Court of Appeals held that the district court erred in abstaining under *Younger*. The court reasoned that because the federal proceedings did not interfere with the state proceedings, there was no justification for abstention under *Younger*.[13] The court explained that there was

> some overlap, factually and to a lesser extent legally, between this [the federal] action and the proceedings pending in the common pleas court.... However, with the exception of some aspects of [the developer's] claims for injunctive relief, as to which [the developer] concedes abstention is appropriate, the federal claims demonstrate no disrespect for the state's jurisdiction to adjudicate any of the claims pending in the common pleas court. Significantly, [the developer] does not seek to enjoin any state proceedings, nor does it challenge the legality of any township or municipal ordinance. The federal action relates to the appellees' conduct regarding the entire property, while the state proceedings relate to the South parcel.... The ... state proceedings relate to the condemnation of the South parcel, the Township's enforcement of the sign ordinance, the timeliness of the Board's action on the subdivision plan, and the South parcel zoning appeal. In contrast, the federal complaint is based on the appellees' allegedly unlawful course of *conduct*, and does not challenge the legality of any ordinance.... Clearly, therefore, [the developer's] federal cause of action does not raise the concern for federal-state comity addressed by *Younger* abstention. The policies embodied

---

**13.** The court did not discuss the interference element as a threshold requirement per se. Rather, it subsumed its interference analysis within the discussion of the second *Younger* requirement, the important state interests element. The court stated that "[w]hile the second prong of the *Younger-Middlesex* test focuses on the state interests implicated by *state* as opposed to federal actions, abstention under *Younger* presumes that the federal action would interfere with the ongoing state proceedings since, typically, the federal plaintiff's objective in filing the federal action is either to seek an injunction against the state law proceedings themselves or to challenge the law being applied in those proceedings." *Gwynedd*, 970 F.2d at 1200–01. Later, the court stated that "[m]oreover, this federal action is not a case in which important state interests are at stake, such as a state's interest in its judicial system or its interest in land use policy." *Gwynedd*, 970 F.2d at 1202. "Unlike the state proceedings in which the legality of land use ordinances are at issue, here [the developer] alleges that the defendants have *applied* these ordinances maliciously in order to deprive [the developer] of its federal constitutional and statutory rights." *Id.*

in the Municipalities Planning Code are not being attacked-it is rather the application of those policies by a single township that is at issue.... Perhaps most importantly, this is not a land use case. Rather the plaintiffs have alleged the members of the Board used their governmental offices to further an illegal conspiracy to destroy plaintiffs' constitutional rights to conduct a business.

*Gwynedd*, 970 F.2d at 1201–02.

The court thereafter concluded that the district court was wrong to apply the three-part *Younger-Middlesex* test without actually considering whether the federal action would interfere with the state proceedings. The court held that the second prong was not met because the federal action did not interfere with the state proceedings.

As in *Gwynedd*, here, (1) a federal adjudication of the Section 1983 claims will not disrupt the state court adjudication; (2) the federal action relates to defendants' conduct regarding properties other than the one that is the subject of the state proceeding; (3) the state proceeding concerns the propriety of the condemnation of one property whereas the federal proceeding challenges the legality of the defendants' entire course of conduct; (4) plaintiffs are not directly challenging the legality of any ordinance, but rather the application of local policies; and (5) the federal case is not a zoning or land use case, but rather a case that alleges that plaintiffs illegally and violated plaintiffs' rights. As in *Gwynedd*, abstention under *Younger* is inappropriate here.

### 3. *Standing*

Before addressing the merits of plaintiffs' claims, we address the final jurisdictional issue, standing. Gary Grimm and Grimm Brothers both assert that defendants violated their constitutional rights. We consider whether Gary Grimm and/or Grimm Brothers has standing to challenge the legality of defendants' conduct.

#### a. *General Standing Principles*

██ "It is well-established doctrine that for a plaintiff to have standing, he must be able to allege an injury that affects his own legal rights. A plaintiff cannot rest his claim to relief on the legal rights or interests of a third party." *SSDD Enters., Inc. v. Village of Lansing,* No. 95 C 6064, 1998 WL 326727, at *10 (N.D.Ill. June 12, 1998) (internal quotations and citations omitted). Indeed, *Sierra Club v. Morton,* 405 U.S. 727, 740, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) establishes the "direct injury" requirement whereby a plaintiff must have a "direct stake in the outcome of the case."

#### b. *Gary Grimm's Standing*

██ "An individual plaintiff cannot bring a civil rights claim for damages suffered by a corporation." *Colon v. Maddalone,* No. 95 Civ. 0008, 1996 WL 556924, at *3 (S.D.N.Y. Oct. 1, 1996). This is true even where the plaintiff is the sole shareholder of the corporation, its president, or a key employee. *See Gregory v. Mitchell,* 634 F.2d 199, 202 (5th Cir.1981) (holding that officers and shareholders lacked standing in action under Section 1983 to maintain suit to redress injury to corporation); *Diva's, Inc. v. City of Bangor,* 176 F.Supp.2d 30, (D.Me.2001) (holding that owner and president of corporation did not have standing to raise First and Fourth Amendment claims under Section 1983 because she failed to allege any injury flowing to her from the city's actions); *Sterngass v. Bowman,* 563 F.Supp. 456, 459 (S.D.N.Y.1983) (holding that individual's status as sole shareholder of on of the corporate owners of the property at issue did not confer standing on him); *Sawmill Prods., Inc. v. Town of Cicero, Cook Coun-*

*ty, Illinois,* 477 F.Supp. 636, 639 (N.D.Ill. 1979) (holding that officers and shareholders in the corporation lacked standing to sue under Section 1983 because they did not allege any direct personal injury as a result of defendants' conduct). And this is true despite the fact that the putative plaintiff might suffer a personal loss by virtue of losses incurred by the corporation. *See Jones v. Niagara Frontier Transp. Auth.,* 836 F.2d 731, 736 (2d Cir. 1987) (holding that individual lacks standing to bring civil rights claim for damages suffered by corporation even if individual faces the risk of financial loss); *Sterngass,* 563 F.Supp. at 459 (holding that officer or shareholder lacks standing even though the wrong to the corporation threatens the officer or shareholder with financial loss); *Sawmill Products,* 477 F.Supp. at 639 (noting that other courts have denied standing even where officers allege a personal loss resulting from a diminution in their anticipated salaries); *Marty's Adult World of New Britain v. Guida,* 453 F.Supp. 810, 813 (D.Conn.1978) (finding standing lacking where officers alleged only that they suffered personal losses of anticipated salaries that would not be recovered through damages paid to the corporation and no separate injury to them as individuals). A person is not entitled to bring a Section 1983 claim arising from harm suffered by the corporation, but must allege a separate harm to himself/herself personally in order to have standing. *Diva's,* 176 F.Supp.2d at 39; *SSDD Enterprises,* 1998 WL 326727 at *10; *Marty's Adult World,* 453 F.Supp. at 813.

■ Applying these principles to the facts before us, we find that Gary Grimm has standing to challenge the constitutionality of the citations that were issued against him personally.[14] Where the citations have been issued against him as an individual for occupying condemned property, Gary Grimm succeeds in making out a claim that he has personally suffered a cognizable injury, distinct from any suffered by the corporation. He has standing to assert that the issuance of any one of these citations, or the defendants' conduct in issuing these citations as a whole, violates his First and Fourteenth Amendment rights under Section 1983.

■ However, Gary Grimm may not in his individual capacity challenge the constitutionality of the condemnation notices and the citations that were issued against Grimm Brothers.[15] The basement of 857 Cherry Street and the property located at 837 Swede Street, the condemned properties, are owned by Grimm Brothers, and not by Gary Grimm personally. Plaintiffs have not made any allegations or provided

**14.** These citations include (1) the April 19, 2000 citation issued against Gary Grimm for occupying the condemned 837 Swede Street property; (2) the April 30, 2000 citation issued against Gary Grimm for occupying the condemned 837 Swede Street property; (3) the September 20, 2000 citation issued against Gary Grimm for occupying the condemned 837 Swede Street property; and (4) the September 26, 2000 citation issued against Gary Grimm for permitting tenants to occupy the condemned 837 Swede Street property.

**15.** The citations issued against Grimm Brothers include (1) the July 17, 2000 citation for failing to maintain the property located at 837 Swede Street free from weeds; (2) the August 10, 2000 citation for failure to obtain a use and occupancy certificate for a new tenant space at 857 Cherry Street; (3) the August 25, 2000 citation for allowing workers to enter the condemned 857 Cherry Street property; and (4) the October 11, 2000 citation for refusing access to 857 Cherry Street for an annual inspection. We note that plaintiffs' assertion that Gary Grimm was cited personally on August 25, 2000 is incorrect. *See* Pls.'s Answer to Defs.' Mot. for Sum. Judg. at 30. A copy of the August 25, 2000 citation, included in the record, shows that Grimm Brothers was cited, not Gary Grimm.

any evidence to indicate that Gary Grimm has personally suffered injury as a result of the condemnations and, in the absence of such allegations and evidence, we will not infer that the condemnation of these properties harmed him separate and apart from any harm to Grimm Brothers, the owner of the properties. The fact that he is the president and sole officer of the company does not confer individual standing on him. Plaintiffs have neither alleged nor offered any evidence that the condemnation actions or multiple citations issued against Grimm Brothers caused any personal injury to Gary Grimm separate from that suffered by the corporation.

### c. *Grimm Brothers's Standing*

 Although a corporation is not a "citizen" within the meaning of the privileges and immunities clause of the Fourteenth Amendment and does not have standing to bring a claim under that clause, a corporation is a "person" for the purposes of the equal protection and due process clauses of the Fourteenth Amendment and does have standing to bring suit under these clauses. *See Grosjean v. Am. Press Co.*, 297 U.S. 233, 244, 56 S.Ct. 444, 80 L.Ed. 660 (1936); *see also Safeguard Mut. Ins. Co. v. Miller*, 472 F.2d 732, 733 (3d Cir.1973). A corporation also has standing to bring an action under 42 U.S.C. § 1983.[16] *See Sterngass v. Bowman*, 563 F.Supp. 456, 459 (S.D.N.Y.1983); *Sawmill Prods., Inc. v. Town of Cicero, Cook County, Illinois*, 477 F.Supp. 636, 638 (N.D.Ill.1979); *Comtronics, Inc. v. Puerto Rico Tel. Co.*, 409 F.Supp. 800, 806 (D.P.R.1975); *Philadelphia Newspapers, Inc. v. Borough Council, Mayor, Manager and Dir. of Public Works of the Borough of Swarthmore*, 381 F.Supp. 228, 245 n. 2 (E.D.Pa.1974). And, indeed, a corporation

has standing to bring most constitutional and statutory claims. *See Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658, 687, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("... it is well understood that corporations should be treated as natural persons for virtually all purposes of constitutional and statutory analysis.")

 Applying these principles to the present case, we find that insofar as Grimm Brothers challenges the condemnation actions and the multiple citations that were issued against Grimm Brothers, Grimm Brothers has standing to bring the section 1983 retaliation claims, *see Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310 (9th Cir.1989) (case in which corporation that sold and distributed petroleum products brought civil rights action against county, air pollution control district and district employees alleging that their suspension of bulk petroleum permit was in retaliation for exercise of First Amendment rights), and the section 1983 substantive due process claims, *see, e.g., Safeguard Mut. Ins. Co. v. Miller*, 472 F.2d 732 (3d Cir.1973) (case stating that corporation has standing to bring suit under the due process clause of the Fourteenth Amendment) and *Philadelphia Newspapers, Inc. v. The Borough Council, Mayor, Manager and Director of Public Works*, 381 F.Supp. 228, 245 n. 2 (case stating that corporation has standing to bring action under Section 1983). Grimm Brothers has standing to challenge the condemnation actions as retaliatory and a violation of its substantive due process rights because Grimm Brothers owns both of the condemned properties. The corporation can allege a cognizable injury that it itself has suffered by virtue of the condemning of

---

16. The right of a corporation to bring suit under Section 1983 eliminates the need for the recognition of a right in shareholders or corporate officers or directors to bring suit

for injury to the corporation. *Sterngass v. Bowman,* 563 F.Supp. 456, 459 (S.D.N.Y. 1983). See discussion, *supra* at IV.A.3.c.

the two properties. Indeed, Grimm Brothers could not continue with its normal operation of the buildings because of the allegedly retaliatory and illegal condemnations. Grimm Brothers can also challenge the multiple citations issued against it because Grimm Brothers can allege cognizable injuries that it suffered as a result of the citations issued against it. Indeed, Grimm Brothers was required to remedy the conditions that were the subject of the citations, despite Grimm Brothers' belief that many of the changes are not required by law.

■ However, Grimm Brothers may not challenge any of the citations issued against Gary Grimm personally. Each of the citations issued against Gary Grimm was issued because he was occupying or permitting others to occupy the condemned property. Although plaintiffs might argue that Grimm Brothers should have standing to challenge the citations issued against Gary Grimm because Gary Grimm was occupying the buildings in order to ensure Grimm Brothers' operation and because the company was injured when Gary Grimm was penalized for occupying the premises, we find this connection to be too tenuous to allow Grimm Brothers standing to challenge these citations.

Nor does Grimm Brothers have standing to challenge the citations issued against Gary Grimm personally as being part of a course of conduct that was retaliatory against Grimm Brothers. *See SSDD Enters., Inc. v. Village of Lansing,* No. 95 C 6064, 1998 WL 326727, at *10 (N.D.Ill. June 12, 1998) (noting that standing is not conferred by claiming a loss of constitutional rights not just as a result of specific actions taken, but also because those incidents, taken in their totality, form a pattern of unconstitutional conduct; "That ar-

gument blurs the distinction between a constitutional violation and the injury caused by that violation. Proof of the latter . . . confers standing, but the mere allegation that a plaintiff suffered a deprivation of a constitutional right does not.")

In sum, because Grimm Brothers has not offered any evidence showing that the company suffered injury as a result of the citations issued against Gary Grimm, it may not challenge the citations issued against Gary Grimm; it may challenge only the citations issued against Grimm Brothers.[17]

### B. *Claims Under 42 U.S.C. § 1983*

#### 1. *Analytical Framework*

■ 42 U.S.C. § 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States. Section 1983 does not create any new substantive rights, but instead provides a remedy for the violation of a federal constitutional or statutory right. *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *Gruenke v. Seip,* 225 F.3d 290, 298 (3d Cir.2000). To state a claim under Section 1983, a plaintiff must show that the defendant, through conduct sanctioned under the color of state law, deprived her of a federal constitutional or statutory right. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.E.2d 420 (1981); *Gruenke,* 225 F.3d at 298.

If plaintiffs have made out a prima facie case for the deprivation of a federal right under color of state law, then we must determine whether the defendants, if any, must proceed to trial. The individual de-

**17.** Of course, as discussed *supra* at IV.A.3.b., these acts may be challenged by Gary Grimm, as having violated *his* rights.

fendants can he held liable unless they are entitled to qualified immunity for their actions.

Plaintiffs allege violations of the First and Fourteenth Amendments to the United States Constitution as the bases for their Section 1983 claims. Plaintiffs contend that defendants violated their constitutional rights under the First Amendment by taking actions against plaintiffs in retaliation for plaintiffs' participation in constitutionally protected activities. Plaintiffs contend that defendants' conduct constitutes a violation of the substantive due process component of the Fourteenth Amendment. Defendants submit that plaintiffs have failed to make out any violation of the First or Fourteenth Amendment and, alternatively, that even if a violation is made out, defendants are entitled to qualified immunity for their actions.

### 2. Official Capacity Liability of Defendants O'Donnell and Sweeney

The face of plaintiffs' complaint states that plaintiffs are suing defendants O'Donnell and Sweeney in both their official and individual capacities. The Supreme Court has stated that a suit under Section 1983 against a municipal officer in his or her official capacity is, in actuality, a suit against the municipality that the officer represents; an official capacity suit is essentially treated as a suit against the entity itself. *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). *See also Busby v. City of Orlando,* 931 F.2d 764 (11th Cir.1991); *Ruiz v. Philadelphia Hous. Auth.,* No. CIV.A. 96–7853, 1998 WL 159038, at *6 (E.D.Pa. March 17, 1998); *Verde v. City of Philadelphia,* 862 F.Supp. 1329, 1336–37 (E.D.Pa.1994); *Agresta v. City of Philadelphia,* 694

F.Supp. 117, 119 (E.D.Pa.1988); *Baldi v. City of Philadelphia,* 609 F.Supp. 162, 168 (E.D.Pa.1985). Accordingly, we will dismiss the Section 1983s claim brought against O'Donnell and Sweeney in their official capacity.[18] The remainder of the Section 1983 discussion considers the claims brought against the defendants in their individual capacities.

### 3. Actions Under Color of State Law

It is clear that the condemnation notices and citations that are the subject of plaintiffs' Section 1983 claims were issued under color of state law. O'Donnell and Sweeney were acting in their official capacity when inspecting the properties, observing the alleged violations and writing the citations. Actions by an official in his/her official capacity are under color of law even if they are not in furtherance of state policy and even if they violate state law. *See Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

### 4. First Amendment Retaliation Claim

### a. Nature of the First Amendment Right Against Retaliation

The next step in evaluating any Section 1983 claim is to identify the specific constitutional right allegedly infringed. *See Albright v. Oliver,* 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). Plaintiffs allege that the issuance of condemnation notices and citations constitutes unlawful retaliation. "The Supreme Court has explicitly held that an individual has a viable claim against the government when he is able to prove that the government took action against him in retaliation for his exercise of First Amendment rights." *Anderson v. Davila,* 125 F.3d 148, 160 (3d

---

**18.** The portion of plaintiffs' suit that seeks damages from O'Donnell and Sweeney in their individual capacities is properly pled and, at least as a matter of pleading, survives.

We are at a loss to understand why lawyers continue to bring official capacity claims knowing that they will be dismissed.

Cir.1997) (citing *Mt. Healthy City School Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). As the Third Circuit has indicated,

> [u]nder *Mt. Healthy* and its progeny, an otherwise legitimate and constitutional government act can become unconstitutional when an individual demonstrates that it was undertaken in retaliation for his exercise of First Amendment rights. This doctrine demonstrates that, at least where the First Amendment is concerned, the motives of government officials are indeed relevant, if not dispositive, when an individual's exercise of speech precedes government action affecting that individual.

*Id.*

■ To prevail on a First Amendment retaliation claim, a plaintiff must prove that: (1) he/she engaged in protected activity; (2) the government responded with retaliation and (3) the protected activity was the cause of the government's retaliation. *See id.*

### i. *Protected Activity Element*

■ With respect to the first element, whether an activity is protected by the First Amendment is a question of law. *Russoli v. Salisbury Township*, 126 F.Supp.2d 821, 854 (E.D.Pa.2000) (quoting *Watters v. City of Philadelphia*, 55 F.3d 886, 892 (3d Cir.1995)). The Third Circuit has held that the filing of a lawsuit constitutes protected activity. *See Anderson*, 125 F.3d at 161.

■ In order to qualify speech as a protected activity under the First Amendment, a plaintiff must ordinarily show that the speech is a matter of public concern. Where the protected First Amendment activity is the freedom of association, however-

er, the circuits are split as to whether a plaintiff must show that the association is a matter of public concern. *See Dist. Council 20 v. The Dist. of Columbia*, No. Civ.A. 97–0185(EGS), 1997 WL 446254, at *10 (D.D.C. July 29, 1997). The Third Circuit has refused to take a formal position on this issue. *See Sanguigni v. Pittsburgh Bd. of Public Educ.*, 968 F.2d 393 (3d Cir.1992) (refusing to address whether the public concern requirement applies to claims involving the freedom of association, but holding that the public concern requirement did govern the public school teacher's freedom of association claim).[19] Additionally, where the protected activity is the plaintiff's lawsuit, in this Circuit, a plaintiff need not prove public concern. *See Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Anderson*, 125 F.3d at 162; *Russoli*, 126 F.Supp.2d at 854.

### ii. *Retaliation and Causation Requirements*

In addition to demonstrating that he/she was engaging in protected activity, the remaining retaliation elements require a plaintiff to show a causal connection between the protected activity and the defendant's conduct: a plaintiff must show that the defendant's conduct was taken in retaliation for the plaintiff's exercise of First Amendment rights. *See Russoli*, 126 F.Supp.2d at 854–55. The United States Supreme Court has indicated that a plaintiff alleging retaliation for the exercise of constitutionally protected rights must initially show that the protected conduct was a "substantial" or "motivating" factor in the defendant's decision. *See Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1971). At that point, the burden

---

**19.** We note that these retaliation cases arose in a public employee context. However, we believe that the courts' treatment of the public concern requirement applies in the broader First Amendment retaliation context.

shifts to the defendant to establish that it would have reached the same decision in the absence of the protected conduct. *See id.*

### iii. *Chilling Effect Requirement*

 There is some dispute as to whether a plaintiff must also, in addition to alleging that the protected activity was a substantial or motivating factor, allege that the defendant's actions effectively chilled the exercise of First Amendment rights. *See id.*, 126 F.Supp.2d at 856. Retaliation claims under the First Amendment are generally divided into two categories or subsets: (1) claims alleging interference with a person's right of access to the courts and (2) claims alleging retaliation for activities protected under the First Amendment. *See Anderson*, 125 F.3d at 163 n. 15; *Russoli*, 126 F.Supp.2d at 856. The rule in this Circuit appears to be that in cases alleging interference with a person's right of access to the courts, a plaintiff must allege that the defendant's actions chilled the exercise of this right, but that in cases alleging retaliation, a plaintiff need not allege that defendant's conduct had a chilling effect. *See Anderson*, 125 F.3d at 163 n. 15; *Russoli*, 126 F.Supp.2d at 856.[20]

### b. *Application of Principles: Plaintiffs' Motion for Partial Summary Judgment*

Applying these guiding principles to the case before us, we consider first Plaintiffs'

Motion for Partial Summary Judgment. "[P]laintiffs seek partial summary judgment for violation of their civil rights because, in issuing the citation, O'Donnell directly, knowingly and wrongfully penalized them for asserting their right under the Constitution to refuse a warrantless search of their property." (Pls. Mot. for Part. Sum. Judg. at 2.)

### i. *Protected Activity: Refusal of Access to Conduct Search*

 It appears that the protected activity that plaintiff alleges here is the refusal of access to 857 Cherry Street to conduct a warrantless inspection of the property. Their claim appears to be a straightforward retaliation claim: O'Donnell retaliated against plaintiffs for their refusing access to conduct the inspection when he cited Grimm Brothers for refusing access. Although private citizens have a constitutional right to refuse access to officials intent on conducting an administrative search of a non-public building in the absence of a search warrant, *see Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), plaintiffs's refusal does not qualify as a protected activity insofar as their retaliation claim is based on the First Amendment; plaintiffs have offered no evidence showing that this refusal was a matter of public concern, as opposed to a purely private dispute, as is required in order for conduct to qualify as protected activity under the First Amendment.[21]

---

**20.** We note that in *Anderson* and *Russoli*, the cases cited for this proposition, the protected activity underlying the plaintiff's claim was the filing of a lawsuit. However, we think that the rule that in retaliation (as opposed to right of access) cases, a plaintiff need not prove a chilling effect applies equally to retaliation cases where the protected activity is not the filing of a lawsuit, but some other protected activity. Indeed, although the protected activity in *Anderson* and *Russoli* was the filing

of a lawsuit, both cases speak in general terms; with respect to the chilling effect requirement, they draw a distinction between right of access cases and retaliation cases generally, not between right of access cases and retaliation cases where the protected activity is the filing of a lawsuit specifically.

**21.** It is unclear from plaintiffs' motion whether their retaliation claim is based on a right protected by the Fourth or the First Amendment. In their memorandum, they allege that

## ii. *Protected Activities: Political and Legal Activities*

■ However, it is possible to consider not only the refusal of access, but also plaintiffs' association with NAIL and NI and plaintiffs' participation in lawsuits against the Borough as the constitutionally protected activities.[22] We find that both plaintiffs' association with NAIL and NI and plaintiffs' participation in the lawsuits constitute constitutionally protected activities in satisfaction of the first prong.

First, the First Amendment protects plaintiffs' freedom to associate with NAIL and NI. Additionally, assuming that plaintiffs must show that the association is a matter of public concern[23], we find that the conduct engaged in by plaintiffs as a part of these two groups is a matter of public concern. Indeed, NAIL and NI are involved in investigating and challenging licensing fees charged by the Borough—a matter of concern to other citizens of the Borough. As for the lawsuit, as noted above at IV.B.4.a.i., participation in a lawsuit is a protected activity[24]; there is no

the right to refuse access is protected under the Fourth Amendment. However, the retaliation cases they cite, *Keenan v. City of Philadelphia*, 983 F.2d 459 (3d Cir.1992), *Laskaris v. Thornburgh*, 733 F.2d 260 (3d Cir.1984), *Greenwich Citizens Comm., Inc. v. Counties of Warren and Washington Indus. Dev. Agency*, 77 F.3d 26 (2d Cir.1996) and *Smith v. Hightower*, 693 F.2d 359 (5th Cir.1982), are based on the First Amendment. Insofar as plaintiffs claim retaliation under the First Amendment with the protected activity being the refusal of access, their claim fails.

However, the Third Circuit has held that "official retaliation for the exercise of *any* constitutional right creates an actionable claim under Section 1983. 'Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under section 1983.' " *Anderson v. Davila*, 125 F.3d 148, 162 (3d Cir.1997) (quoting *White v. Napoleon*, 897 F.2d 103, 111–12 (3d Cir.1990)) (holding that doctor's retaliatory charges against prisoner who exercised right to be informed about treatment constituted violation of prisoner's substantive due process rights). It is possible that plaintiffs are attempting to state a retaliation claim not under the First Amendment, but under the logic of the line of cases discussed in *Anderson*. Insofar as plaintiffs' retaliation claim can be read in this manner, the refusal of access is a constitutionally protected right, and plaintiffs succeed in stating a claim. For the same reasons outlined in our discussion of plaintiffs' First Amendment retaliation claim, material issues of fact exist with respect to whether defendants' actions were retaliatory. This claim must go to trial.

22. Although it is not entirely clear from the papers filed by plaintiffs whether plaintiffs

make this argument, we think it plausible and nonetheless consider it.

23. For a discussion of whether plaintiffs must show that the protected activity of association is a matter of public concern, *see supra* at IV.B.4.a.i.

24. It is possible for a plaintiff to allege the filing of a lawsuit as the constitutionally protected activity as the basis for either a retaliation case, a right of access case, or both.

Plaintiffs do not specify whether they are pursuing a claim alleging retaliation for activities protected under the First Amendment or a claim alleging interference with their right of access to the courts, or both. If, and insofar as, plaintiffs are pursuing a right of access claim, their claim fails. Plaintiffs have failed to offer any evidence showing, as is necessary when alleging interference with the right of access to the courts, that defendants' actions had a chilling effect. And the record contravenes any inference that plaintiffs' were deterred from seeking judicial involvement; plaintiffs have brought claims at the administrative, state and federal levels. Thus, insofar as plaintiff is alleging that defendants interfered with their right of access by retaliating against plaintiffs for their filing lawsuits, we will grant partial summary judgment to defendants.

We clarify that even where the protected activity is the filing of a lawsuit, where the plaintiff is pursuing a retaliation (as opposed to an interference with the right of court access) theory, he/she need not prove a chilling effect. *See, e.g., Russoli*, 126 F.Supp.2d at 856 (where protected activity was filing of lawsuit, drawing distinction between retaliation theory, where plaintiff need not show

need to prove public concern with respect to the initiation of a lawsuit.[25]

### iii. *Analysis of Retaliation and Causation Elements*

■ Having concluded that plaintiffs engaged in protected activities, we now turn to whether the record reflects a material dispute of fact on the remaining prongs. We must consider whether O'Donnell's conduct was taken in retaliation for plaintiffs' exercise of First Amendment rights and whether the protected activity was a substantial or motivating factor for O'Donnell's actions. The following facts are undisputed. After failing to gain access to the property located at 857 Cherry Street to conduct an inspection, O'Donnell notified Gary Grimm by letter that an inspection of 857 Cherry Street was scheduled for October 10, 2000 and indicated that if Gary Grimm failed to appear for this inspection, he would issue a citation for non-compliance. Gary Grimm wrote a letter to O'Donnell on October 5, 2000 stating that he believed that he was a target of the Borough and refusing access to any of his properties. Gary Grimm did not appear at the October 10, 2000 inspection, and on October 11, 2000, O'Donnell issued a citation against Grimm Brothers for refusing access to the building. O'Donnell also obtained a warrant on October 11, 2000 to conduct the inspection. Thereafter he conducted the inspection and issued a citation against Grimm Brothers for failing to correct various code violations that he had previously ordered be corrected by September 14, 2000.

Although what happened is not in dispute, whether O'Donnell issued the citation because of improper retaliatory motives is disputed. Plaintiffs point out that O'Donnell was aware that where a property owner refuses consent to search, as Gary Grimm clearly did on behalf of Grimm Brothers, and where exigent circumstances are lacking, an official must obtain a warrant from a court before conducting a search; indeed, after O'Donnell was refused access, he did in fact obtain a warrant. Plaintiffs submit that the fact that O'Donnell issued a citation for plaintiffs' refusing access despite his awareness that the law required him to obtain a warrant goes toward showing that he issued the citation out of improper motives.

■ Defendants, on the other hand, maintain that O'Donnell was entitled to issue the citation pursuant to various BOCA provisions and the Borough Ordinances. Borough Ordinance Section ES–105.3.2.1 provides that "[f]ailure to comply with the Right of Entry section will be a violation of this code and the penalty will be in accordance with Section ES–110.2." The Right of Entry section provides that

> [i]f any owner, occupant, or other person in charge of a structure subject to the provisions of this code refuses, impedes, inhibits, interferes with, restricts, or obstructs entry and free access to any part of the structure or premises where inspection authorized by this code is sought, the administrative authority shall be permitted to seek, in a court of competent jurisdiction, an order that such owner, occupant or other person in charge cease and desist with such interference.

The Commentary to this section provides that the administrative authority may also seek a search warrant. Defendants read this section to provide for the imposition of

---

chilling effect, and right of access theory, where plaintiff need show chilling effect).

**25.** Defendants concede that the lawsuits constitute protected activity under the First Amendment. *See* Defs.' Mot. for Sum. Judg. at 21.

a penalty if plaintiffs refuse access even before the official seeks a court order.

We are constrained to give this ordinance a constitutional reading. We find that the ordinance cannot constitutionally allow for the imposition of a penalty against citizens who refuse access before a court order is obtained. Citizens are constitutionally entitled to require that the government seek a search warrant before conducting an administrative search of this sort. *See Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). It would be anomalous to allow for the imposition of a penalty for the assertion of this constitutional right. We read Ordinance Section ES–105.3.2.1 and the BOCA Code to allow officials to impose a penalty against the owner of non-public property only if the owner acts to interfere with the inspection *after* a court order has been obtained, but not before. We find, therefore, that as a matter of law, the issuance of the citation was improper. Nonetheless, drawing all reasonable inferences in defendants' favor, this does not, as plaintiffs suggest, necessitate the finding that the issuance of the citation was substantially motivated a desire to retaliate against plaintiffs for their political and legal activity and does not necessitate our granting summary judgment in plaintiffs' favor; in other words, even though the citation should not have been issued as a constitutional matter, it is still possible that the protected activity was not the motivating factor for the issuance of the citation. We find that there is a material dispute of fact as to whether O'Donnell was motivated by improper purposes and whether the protected activities were the substantial or motivating factor, and there-

fore must deny Plaintiffs' Motion for Partial Summary Judgment.

### c. Application of Principles: Defendants' Motion for Summary Judgment

Defendants have moved for summary judgment on all of plaintiffs' claims; with respect to plaintiffs' First Amendment retaliation claim, they move for summary judgment as to all of the incidents that form the basis of plaintiffs' claim.[26] We consider each of the incidents that form the First Amendment retaliation claim in turn.

### i. Refusal of Access Citation: Analysis

We begin by analyzing the citation issued for refusal of access that was the subject of Plaintiffs' Motion for Partial Summary Judgment. Viewing the evidence in the light most favorable to plaintiffs and drawing all reasonable inferences in plaintiffs' favor, we first consider whether plaintiffs have made out a prima facie case for the deprivation of a constitutional right.

As discussed *supra* at IV.B.4.b.i., plaintiffs' refusal of access is not a protected activity for First Amendment retaliation purposes; thus, insofar as plaintiffs are alleging the refusal of access as the protected activity for the purposes of their First Amendment retaliation claim, we grant partial summary judgment in defendants' favor.

However, plaintiffs' association with NAIL and NI and plaintiffs' participation in the lawsuits against the Borough are constitutionally protected. Turning to

---

**26.** Again, where, as here, the parties submit cross-motions for summary judgment, the court must consider the merits of each motion and, for each, view all evidence in the light most favorable to the non-moving party, draw all reasonable inferences in favor of the non-movant and, where the evidence cited contradicts that invoked by the moving party, take the non-moving party's version as true. *See Gavigan v. The Southland Corp.*, No. Civ.A. 97–2807, 1998 WL 103380, at *1 (E.D.Pa. Feb. 28, 1998)

whether plaintiffs sufficiently allege that their protected conduct was a substantial or motivating factor for the issuance of the citation, we note that "[i]n response to a motion for summary judgment on a retaliation claim, the plaintiff may not respond simply with general attacks upon the defendant's credibility. The plaintiff must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden." *Russoli,* 126 F.Supp.2d at 855 (internal citations omitted). Plaintiffs offer the fact that O'Donnell was aware of the warrant requirement as evidence that the citation was issued in retaliation. Additionally, plaintiffs offer evidence that O'Donnell knew about plaintiffs' association with NAIL and plaintiffs' participation in the lawsuits against the Borough. (T. O'Donnell Dep. at 15–16.) This evidence, especially when viewed in light of the other evidence plaintiffs offer as to the allegedly retaliatory actions taken by defendants, is sufficient; a reasonable factfinder could conclude, based on this evidence, that the decision to issue the citation was motivated by plaintiffs' political and legal activity.[27]

Additionally, defendants have not met their burden of showing that O'Donnell would have engaged in the same conduct even in the absence of plaintiffs' protected conduct. The *Mt. Healthy* test requires defendants to show, by a preponderance of the evidence, that O'Donnell would have reached the same decision in the absence of the conduct by plaintiff. *See Soranno's Gasco, Inc. v. Morgan,* 874 F.2d 1310, 1315 (9th Cir.1989). *At best,* defendants have shown that he *could* have issued the citation. This is insufficient to support summary judgment. *See id.*

■ Having found that plaintiffs have succeeded in alleging the violation of a constitutional right, we consider whether defendants are entitled to qualified immunity. Whether defendants are entitled to qualified immunity is an issue appropriate for resolution on summary judgment. Indeed, the United States Supreme Court has repeatedly emphasized the importance of resolving immunity questions at the earliest possible state in litigation because "[t]he entitlement is an immunity from suit rather than a mere defense to liability." *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). The purposes of the qualified immunity defense are served when the defense is recognized at the early stages of litigation, such as the motion to dismiss and summary judgment stages. *See Johnson v. Breeden,* 280 F.3d 1308, 1317 (11th Cir.2002). "Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 2155–56, 150 L.Ed.2d 272 (2001).

■ Qualified immunity shields state officials performing discretionary functions from suit for damages if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). In evaluating defendants' claims of qualified immunity, we must first determine

---

**27.** Although the causal connection between the protected activity and the allegedly retaliatory action is perhaps not as strong as if the protected activity were plaintiffs' refusal of access to search, the connection is nonetheless sufficient to avoid the grant of summary judgment in defendants' favor with respect to the substance of plaintiffs' Section 1983 claim.

whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier,* 121 S.Ct. at 2156. If no constitutional right would have been violated were the allegations established, the inquiry ends; there is no need for further inquiry concerning qualified immunity. *Id.* If, on the other hand, a violation could be established, the next step is to ask whether the right was clearly established. *Id.*

 The United States Supreme Court has stressed that in order for the right to be relevant to the case under consideration, the right the official is alleged to have violated must be clearly established in the particularized sense; that is, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier,* 121 S.Ct. at 2156. The dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his/her conduct was unlawful in the situation he confronted. *Id.* If a reasonable officer would have known that his/her conduct violated the right, then the defendant-officer is not entitled to qualified immunity for his/her actions. *See Harlow,* 457 U.S. at 813–20, 102 S.Ct. 2727; *Bartholomew v. Commonwealth of Pennsylvania,* 221 F.3d 425, 428 (3d Cir. 2000).[28]

 With respect to this reasonableness component, at the summary judgment phase, a public official can avoid a denial of qualified immunity only if he/she meets her burden of establishing undisputed and material predicate facts which demonstrate that his/her actions were reasonable under the circumstances. *Vaughn v. Ruoff,* 253 F.3d 1124, 1127 (8th Cir.2001). If the material predicate facts are undisputed, the reasonableness inquiry is a question of law, to be resolved by the court. *Id.* If, however, there is a genuine dispute over material predicate facts, a public official cannot obtain summary judgment. *Id.*

 Plaintiffs have put forth sufficient allegations that, if proven, would show the violation of plaintiffs' clearly established rights to associate with others and to file lawsuits challenging the legality of governmental conduct, and to be free from retaliation for exercising those rights. We turn now to whether the right was clearly established. Admittedly, there is no case that mirrors the facts of this case exactly. Nevertheless, "[t]he term 'clearly established' does not necessarily refer to commanding precedent that is factually on all-fours with the case at bar or that holds that the very action in question is unlawful. Instead, the right is clearly established if it is based on pre-existing law, and the unlawfulness of the conduct in question is apparent." *Chiu v. Plano Indep. School Dist.,* 260 F.3d 330, 343 n. 7 (5th Cir.2001); *see also Vaughn,* 253 F.3d at 1129. We find that there are cases that lay out the contours of the rights alleged by plaintiffs in a sufficiently clear manner such that a reasonable individual in O'Donnell's position would understand whether his/her actions were lawful or not. *See, e.g., Nestor Colon Medina & Sucesores, Inc. v. Custodio,* 964 F.2d 32 (1st Cir.1992) (holding that plaintiffs stated retaliation claim where they were denied residential site permits after publicly criticizing political party in power in Puerto Rico); *Soranno's Gasco, Inc. v. Morgan,* 874 F.2d 1310 (9th Cir.1989) (holding that genuine issue of material fact existed as to whether suspension of permits was in retaliation for plaintiffs' publicly criticizing the county air pollution control district and initiating law-

---

**28.** If the right is not clearly established in this sense, then the officer is entitled to qualified immunity. *See Vaughn v. Ruoff,* 253 F.3d 1124, 1128 (8th Cir.2001).

suits, precluding summary judgment); *Harrison v. Springdale Water & Sewer Comm'n,* 780 F.2d 1422 (8th Cir.1986) (finding plaintiffs stated claim under Section 1983 for infringement of their constitutional right of access to the courts when city water and sewerage commission fabricated counterclaim in lawsuit brought by landowners).[29]

■■■ We find that defendants have not established undisputed facts showing that O'Donnell acted reasonably in issuing the citation for refusal of access. A factfinder could believe that a reasonable officer in O'Donnell's position would not have issued the citation for refusal of access and, based upon the evidence offered by plaintiffs, that O'Donnell issued the citation in retaliation for plaintiffs' association with NAIL and NI and their filing of lawsuits against the Borough. Accordingly, we will deny without prejudice defendants' motion for summary judgment on the basis of qualified immunity from the Section 1983 First Amendment retaliation claim with respect to this particular incident.[30]

ii. *Arguments Advanced by Defendants to Support Motion for Summary Judgment*

We turn now to the remainder of the actions taken by defendants that form the basis of plaintiffs' First Amendment retaliation claim.[31] Defendants raise several points in their motion for summary judgment that they contend show that plaintiffs cannot prove that retaliated against plaintiffs and thus, they argue, necessitate a finding in their favor.

■■■ First, defendants point out that the lawsuits are between three to six years old, and suggest that this gap in time is too large to support an inference of retaliation. Temporal proximity between the protected activity and the allegedly retaliatory action is, without question, a factor to consider in retaliation cases. *See Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 279–80 (3d Cir.2000) (noting that temporal proximity has probative value in retaliation cases, but that other evidence suggesting a causal connection between protected activity and allegedly retaliatory action may be considered); *Krouse v. Am. Sterilizer Co.,* 126 F.3d 494, 503 (3d Cir. 1997) (noting that if timing alone could ever be sufficient to establish a causal link, the timing of the alleged retaliatory action must be "unusually suggestive" of retaliatory motive); *see generally Russoli,* 126 F.Supp.2d at 855.[32] Without deciding whether the temporal relationship here establishes retaliation, we simply note that defendants' argument ignores two impor-

---

29. We note that defendants concede that this right is clearly established. *See* Defs.' Mot. for Sum. Judg. at 21.

30. Defendants may re-assert the qualified immunity defense at the end of plaintiffs' case in a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). *See Johnson,* 280 F.3d at 1317–18; *Russoli,* 126 F.Supp.2d at 857 n. 20.

31. Again, we note that whereas plaintiffs have moved for partial summary judgment with respect to only one of the citations, defendants have moved for summary judgment on plaintiffs' First Amendment retaliation claim with respect to all of the incidents alleged.

32. We note that defendants are not entirely accurate in citing to *Russoli* in support of their argument that this Circuit requires a showing of temporal proximity along with other evidence to support a finding of retaliation. *Russoli* did not consider whether temporal proximity was necessary, but rather whether temporal proximity could ever be, by itself, sufficient to establish retaliation. This Court noted there that most Third Circuit cases require evidence in addition to evidence of temporal proximity in order to find retaliation.

tant related facts that go toward supporting an inference of retaliation. First, although initiated several years ago, the lawsuits against the Borough were recently settled; thus, the time span between the legal activity and the allegedly retaliatory conduct is closer than defendants suggest. Second, defendants do not address plaintiffs' participation in NAIL and NI in terms of temporal proximity; this separate and, in some respects, distinct protected activity has been continuous and provides another basis from which retaliation may be inferred.

█ Second, defendants highlight that other NAIL members participated in the lawsuits against the Borough and have not brought any retaliation claims against the Borough or its officials. Although this fact may have some relevancy, it certainly does not establish that defendants did not engage in retaliatory action against Gary Grimm or Grimm Brothers.

█ Defendants thirdly point out that the lawsuits were not against O'Donnell or Sweeney and that they were not affected by the settlements. Although this point undoubtedly goes toward showing that defendants lacked retaliatory motive, we note that defendants ignore additional facts that could cut the other way. First, O'Donnell had knowledge of the litigation between Gary Grimm and the Borough, and in fact was deposed in connection with the lawsuits. (T. O'Donnell Dep. at 15–16). Likewise, Sweeney was aware of Grimm Brothers' involvement with the lawsuits. (C. Sweeney Dep. at 41, 44.) Second, both O'Donnell and Sweeney were aware of Gary Grimm's and Grimm Brothers' involvement with NAIL. (T. O'Donnell Dep. at 15; C. Sweeney Dep. at 45.) Defendants ignore that O'Donnell and Sweeney had knowledge of both the lawsuits and the activities of the organization, all of which, plaintiffs argue, could be interpreted as implicitly criticizing the actions of the Borough government and officials like O'Donnell and Sweeney.

Fourthly, defendants note that several citations were issued against plaintiffs prior to the initiation of the lawsuits. Again, although this goes towards establishing that defendants were motivated by actual code violations, rather than retaliatory motives, it does not compel the conclusion that the citations were not retaliatory.

█ Lastly, defendants note that the Mayor of the Borough has recently adopted a policy of increased building code enforcement. Defendants argue that his increased enforcement efforts provide a neutral explanation for the citations issued against plaintiffs. Again, although this fact may go against a finding of retaliation, it does not conclusively establish that defendants' actions were not in fact retaliatory.

We reject defendants' invitation to find on the basis of these points that plaintiffs have failed to show that defendants retaliated against plaintiffs. Plaintiffs have made allegations and have advanced supporting evidence from which the factfinder could conclude that defendants engaged in retaliation. These points that defendants raise, when viewed in light of the opposing evidence offered by plaintiffs and after drawing all reasonable inferences in plaintiffs' favor, at most establish that there is a real dispute of fact as to whether defendants engaged in retaliation, but do not show that plaintiffs have failed to make out a case of retaliation,

iii. *Arguments Advanced by Defendants as to Causation Requirement*

Defendants argue additionally and in the alternative that plaintiffs cannot show that the protected activity was a substantial or motivating factor for defendants' actions. We will consider each of the citations in turn in deciding whether plaintiffs have

put forth sufficient allegations and supporting evidence to establish that the protected activity was a substantial or motivating factor.

██ We consider first the citations that were issued against Gary Grimm personally. Plaintiffs allege that on April 19, 2000, Sweeney issued a citation against Gary Grimm for having workers inside 837 Swede Street without a work permit not for any proper purpose, but rather based on improper retaliatory motives. Plaintiffs point to Sweeney's deposition testimony, where he conceded that there was no permit that Gary Grimm could have obtained under Borough ordinances[33] that would have allowed for the workers to be on the premises, and to the fact that a state court adjudged Gary Grimm not guilty of this alleged violation in support of their retaliation claim. We find that plaintiffs have put forth sufficient evidence from which the factfinder could decide that Sweeney issued this citation for improper retaliatory motives and that plaintiffs' protected activity was the substantial or motivating factor for the issuance of this citation. We note that defendants, on the other hand, point out that the building was condemned and that workers, who Sweeney believed were on the premises conducting normal business operations, and not, as plaintiffs allege, salvaging business records, should not have been in the building for safety reasons.[34] We find that there are material facts in dispute that preclude us from issuing summary judgment in defendants' favor with respect to this citation. This issue will proceed to trial unless Sweeney can show that he is entitled to qualified immunity.

Turning to the qualified immunity defense, there are cases, discussed *supra* at IV.B.4.c.i., that clearly lay out the contours of the right against governmental retaliation protected by the First Amendment such that Sweeney would understand whether the issuance of this citation was lawful or not. We find that defendants have not established undisputed facts showing that Sweeney acted reasonably in citing Gary Grimm for having workers on the premises. A factfinder could believe that a reasonable officer in Sweeney's position would not have issued this citation and could infer that this citation was issued in retaliation for plaintiffs' association with NAIL and NI and for their filing of lawsuits against the Borough. Accordingly, we will deny without prejudice defendants' motion for summary judgment on the basis of qualified immunity from the Section 1983 First Amendment retaliation claim with respect to this particular incident.

---

**33.** BOCA Code Section ES–105.6 gives the code official the power to "adopt and promulgate rules and regulations to interpret and implement the provisions of [the] code to secure the intent thereof." Presumably, this would include the power to adopt reasonable administrative procedures and forms such as a permission slip. Nevertheless, BOCA Code Section ES–110.2 provides fines and imprisonment for violation of any provision "of this code" and we do not believe that either Sweeney or O'Donnell has the authority under the BOCA Code or existing state law to adopt and promulgate a criminal penalty for failure to follow their rules and regulations or obtain a permission slip which is not otherwise provided for in the BOCA Code. Only the Borough itself has the power under state law to enact an ordinance and declare that conduct is a summary offense under The Borough Code. *See* 53 P.S. § § 46006(3), 46202(24), and 48301. "The principle is well-established that a municipality may not delegate legislative power ..." *H.A. Steen, Indus., Inc. v. Cavanaugh,* 430 Pa. 10, 18, 241 A.2d 771 (Pa. 1968).

**34.** We note also that this evidence offered by defendants does not, as is required by *Mt. Healthy,* establish by a preponderance of the evidence that the citations would have issued in the in the absence of plaintiffs' conduct.

Plaintiffs also challenge the citation Sweeney issued on April 30, 2000 against Gary Grimm for his entering the property at 837 Swede Street. Plaintiffs offer evidence showing that Gary Grimm had obtained permits to make repairs to the premises; they point to the fact that Sweeney conceded that Gary Grimm could have been on the premises legally but cited him without first investigating why he was there as indicative of retaliation. They also note that a state court found Gary Grimm not guilty of this alleged violation. We believe that this evidence, especially when viewed in light of the entire record, is sufficient for a factfinder to find that Sweeney improperly cited Gary Grimm, and that plaintiffs' protected activities was the substantial or motivating factor for the issuance of this citation. Defendants respond that Sweeney was entitled to issue the citation because Gary Grimm should not have been in the condemned building; they indicate that Gary Grimm did not appear to be entering the property in order to make the authorized repairs. We find that there are material issues of fact in dispute that preclude us from issuing summary judgment in defendants' favor with respect to this citation. We also find that defendants are not entitled to qualified immunity with respect to this citation. Defendants have not set forth undisputed facts showing that Sweeney's conduct was reasonable. A factfinder could find based on the evidence that we have considered offered that his conduct was not in fact objectively reasonable. Accordingly, we will deny without prejudice defendants' motion for summary judgment on the First Amendment retaliation claim on the basis of qualified immunity with respect to this citation.

Plaintiffs also allege that Sweeney issued the September 20, 2000 citation for occupying the condemned 837 Swede Street property in retaliation against plaintiffs. Plaintiffs point to evidence showing that plaintiffs and a Borough representative agreed before a state court judge on August 30, 2000 that the condemnation would be rescinded and argue that, based on these representations, they believed that they could hold an NI meeting at 837 Swede Street. They offer evidence showing that despite these representations, the Norristown police were called and the meeting was disbanded. They also point out that the citation was dismissed by a state court. This evidence, coupled with other evidence in the record, is sufficient for a factfinder to find that defendants had retaliatory motives and that they were substantially motivated by plaintiffs' political and legal activities in issuing this citation. Defendants dispute that the parties agreed that the condemnation would be rescinded and reply that because the building was condemned, public safety reasons justified their citing Gary Grimm for occupying the premises and disbanding the meeting. We find that material facts are in dispute as to defendants' motives, precluding us from issuing summary judgment in defendants' favor with respect to this citation. Nor have defendants shown that they are entitled to qualified immunity with respect to this incident. Defendants have not put forth undisputed facts showing that a reasonable officer in Sweeney's position would have done the same. A factfinder could find, based on the evidence in the record, that defendants are not entitled to qualified immunity. Therefore, we will deny without prejudice defendants' motion for summary judgment on the basis of qualified immunity with respect to this citation.

Gary Grimm also was cited on September 26, 2000 for allowing tenants to occupy the condemned 837 Swede Street. Again, plaintiffs allege that Gary Grimm allowed the tenants to re-occupy the building based on the representations made by the Borough that the condemnation would be

lifted immediately. We think that plaintiffs have put forth sufficient evidence from which a factfinder could reasonably conclude that the issuance of the September 26, 2000 citation was in retaliation for plaintiffs' participation in protected activities. Again, defendants dispute that the Borough ever made this agreement. We conclude that material issues of fact are in dispute that preclude us from issuing summary judgment in defendants' favor with respect to this citation. Nor are defendants entitled to qualified immunity. They have not put forth undisputed facts showing that the official acted reasonably in issuing this citation. A reasonable factfinder could find that officers in his position would not have believed that issuing a citation under the circumstances was lawful. Accordingly, we deny defendants' claim for summary judgment on the basis of qualified immunity without prejudice with respect to this incident.[35]

■ We will now consider the condemnation actions and the citations issued against Grimm Brothers. Plaintiffs contend that the condemnation of the basement of 857 Cherry Street was improper and retaliatory in nature. They allege that each of the seven conditions that O'Donnell offered in support of condemnation was not actually a violation of the building code or that the condition had been corrected. A factfinder could reasonably find from the evidence offered by plaintiffs with respect to these conditions that O'Donnell's motives were retaliatory and that O'Donnell was substantially motivated to issue the condemnation notice because of plaintiffs' protected activities. Whether these conditions justified condemnation, as defendants contend, or were fabricated to justify what was actually a retaliatory condemnation action, as plaintiffs suggest, is a factual matter that is in dispute.[36] This factual dispute precludes us from granting summary judgment in defendants' favor with respect to the condemnation of the basement of 857 Cherry Street. We find also that defendants are not entitled to summary judgment with respect to their qualified immunity defense. Again, case law clearly establishes plaintiffs' First Amendment right against retaliatory governmental conduct such that defendants would know whether the issuance of this condemnation notice was lawful. Defendants have failed to put forth undisputed evidence that the condemnation was objectively reasonable; drawing all inferences in plaintiffs' favor, the violations that O'Donnell listed in support of the condemnation do not resolve the issue of whether O'Donnell's actions were taken in retaliation. Accordingly, we will deny defendants' motion for summary judgment on the basis of qualified immunity without prejudice as to the condemnation of 857 Cherry Street.

Plaintiffs also challenge the condemnation of 837 Swede Street, which remains in place. Plaintiffs appear to allege that it was unnecessary to condemn the entire building, since the entire building was not damaged and since two electricians certified that the electricity in portions of the building could operate safely; they submit

---

**35.** Plaintiffs were cited several other times after the filing of their complaint. Since plaintiffs do not appear to challenge these citations, they are not a part of this case for purposes of this motion.

**36.** We note that the major dispute appears to involve the condition that certain fire-rated protection be installed. The factfinder will have to decide whether defendants were correct in requiring plaintiffs to install certain fire-rated protection or whether, as plaintiffs contend, the property is grandfathered such that the fire protection requirements are not applicable. And the factfinder will have to weigh the evidence regarding the fire suppression system in deciding whether the condemnation was retaliatory.

that the act of condemning the entire building, rather than the damaged portion only, shows retaliatory animus. Defendants dispute that the building is safe. Plaintiffs also allege that defendants unreasonably required that certain fire protection be installed [37], and that defendants, on several occasions, imposed new and different conditions for the fire protection system, thereby preventing the condemnation from being lifted. Defendants respond that Grimm Brothers is required by law to make these changes, and that they are justified in conditioning the lifting of the condemnation until Grimm Brothers does so. We find that plaintiffs have put forth evidence sufficient to support a finding that this condemnation was motivated by retaliatory purposes. Material facts are in dispute as to whether defendants' conduct was in fact retaliatory and whether plaintiffs' protected activity was a substantial or motivating factor; the factfinder will have to decide this issue unless defendants can prevail on their qualified immunity claim. We find also that defendants cannot prevail on summary judgment on their qualified immunity defense. They have not put forth undisputed facts showing that they are entitled to qualified immunity; a factfinder could believe that a reasonable officer inspecting 837 Swede Street would not have condemned the entire building or have imposed the same conditions for the removal of the condemnation. Accordingly, we deny, without prejudice, defendants' motion for summary judgment on the basis of qualified immunity with respect to the condemnation of 837 Swede Street.

■ Plaintiffs challenge the July 2000 citation issued against Grimm Brothers for failing to remove weeds within the time

ordered. Plaintiffs submit that because the warning was mailed and gave plaintiffs only 48 hours from the date the warning was written within which to comply, it was unreasonable. They also highlight that they did remove the weeds, and notified defendants that they had removed the weeds, but that O'Donnell nonetheless issued the citation. They also indicate that the state court dismissed this citation. We think that a reasonable factfinder could draw an inference from the fact that the citation was issued even though there was no possibility of their complying with the order within the allotted time [38], and from the fact that the citation was not withdrawn even though plaintiffs did comply within a short time, that the citation was retaliatory in nature. Defendants offer evidence that similar warnings and citations were issued against other property owners to show that the notices were motivated by legitimate and not retaliatory motives. We find that there is a real dispute as to whether O'Donnell was motivated by improper purposes in writing this citation that precludes our granting summary judgment in defendants' favor on plaintiffs' First Amendment retaliation claim with respect to this citation. Defendants' qualified immunity defense fails because defendants have failed to advance undisputed facts showing that a reasonable officer in defendants' position would have likewise issued the citation; we will deny their motion with respect to this citation for qualified immunity without prejudice.

■ Plaintiffs challenge the August 10, 2000 citation issued against Grimm Brothers for its failure to obtain a use and occupancy certificate when the tenancy of the basement of 857 Cherry Street

---

**37.** Plaintiffs argue that the 837 Swede Street property is grandfathered and, accordingly, that these protections are not required.

**38.** Where the time runs from the date of the notice and not the date of receipt, and where the notices is mailed, it would seem that a more reasonable time period should be given.

changed. Material facts are in dispute as to whether such a certificate was required by law and as to whether this citation was issued out of proper or retaliatory motives, thereby precluding a grant of summary judgment in defendants' favor with respect to this incident. Defendants have failed to conclusively establish that the issuance of this citation was objectively reasonable; therefore, we will also deny without prejudice defendants' motion for summary judgment on the basis of qualified immunity with respect to this incident.

Lastly, plaintiffs challenge the August 25, 2000 citation issued against Grimm Brothers for permitting workers to enter the condemned 857 Cherry Street property. Plaintiffs stress that the workers were there to make repairs that the Borough had mandated be made. Plaintiffs emphasize that they submitted a list of proposed repairs and had faxed a request for permission to enter the property to make the repairs; yet the citation nonetheless issued. They also highlight that the Borough withdrew this citation in November of 2000. Defendants explain that the citation was issued because plaintiffs had not obtained and completed the standard permission slip from the Borough. Whether there was a legitimate reason for requiring that a particular permission slip be used, it does not appear to support the issuance of a citation.[39] Whether this citation was issued because of retaliatory motives is in dispute; this factual dispute precludes our granting summary judgment in defendants' favor. We will also deny without prejudice defendants' motion for summary judgment on qualified immunity grounds

since defendants have failed to set forth undisputed facts showing that they are entitled to qualified immunity.

### 5. Substantive Due Process Claim

Plaintiffs contend that defendants violated their substantive due process rights, by condemning Grimm Brothers' properties and issuing citations against Gary Grimm and Grimm Brothers for what plaintiffs allege are improper motives.

### a. Nature of the Substantive Due Process Right

■■■■■ The Fourteenth Amendment of the United States Constitution provides in part that "[n]o State [shall] deprive any person of life, liberty, or property without the due process of law." "To prevail on a substantive due process claim under Section 1983, a plaintiff must establish as a threshold matter that he has a protected property interest to which the Fourteenth Amendment's due process protection applies." *Woodwind Estates, Ltd. v. Gretkowski,* 205 F.3d 118, 123 (3d Cir.2000).[40] "Substantive due process protects citizens from arbitrary and irrational acts of government. A violation of substantive due process rights is proven: (1) if the government's actions were not rationally related to a legitimate government interest; or (2) if the government's actions in a particular case were in fact motivated by bias, bad faith or improper motive." *Parkway Garage, Inc. v. City of Philadelphia,* 5 F.3d 685 (3d Cir.1993) (internal quotations and citations omitted). The first inquiry is a matter of law for the court to decide whereas the second inquiry, if there is a

---

**39.** As noted *supra* at footnote 33, the Borough would have to provide for such a permission slip in its ordinances in order to make the failure to obtain such a slip a summary offense.

**40.** The Third Circuit has clarified that some particular property interest must be infringed

before substantive due process can be invoked; substantive due process does not afford protection from *every* arbitrary governmental act. *See Indep. Enters. v. Pittsburgh Water,* 103 F.3d 1165, 1179 n. 12 (3d Cir. 1997).

dispute of material fact, is a question of fact for the factfinder to decide. *See id.*

### b. *Defendants' Position*

Defendants submit that "[p]laintiffs' substantive due process claims fail because plaintiffs have not established that they have been denied a protected property right by arbitrary and capricious governmental action." (Defs.' Mot. for Sum. Judg. at 11.) Defendants claim that the decision to condemn the property was rationally related to health and safety concerns; they argue that plaintiffs have not produced evidence that bias, bad faith or improper motive motivated the condemnations. Plaintiffs dispute that defendants issued the condemnations and citations for legitimate reasons and instead submit that defendants did so for improper retaliatory motives; they argue that the factfinder must resolve this factual dispute.

### c. *Analysis of Substantive Due Process Claim*

We find that plaintiffs have put forth sufficient allegations and evidence that, if accepted, would establish a violation of their substantive due process rights. Additionally, there are material facts in dispute that preclude our granting summary judgment in defendants' favor with respect to plaintiffs' substantive due process claims. With respect to the condemnation actions[41], plaintiffs contend that many of the conditions imposed with respect to 857 Cherry Street and 837 Swede Street were not required by law and, according to plaintiffs, were imposed solely to prevent the condemnations from being removed. Defendants, on the other hand, claim that there were real violations that presented a threat to the healthy, safety and welfare of citizens of Norristown and that the officials were required, by law, to condemn the buildings. With respect to one requirement in particular, the installation of a fire separation at 837 Swede Street, the parties have submitted conflicting reports from engineers as to whether the fire separation is required.[42] The factfinder will have to resolve whether the condemnations were retaliatory in nature.

Likewise, disputes of fact exist as to defendants' motives for issuing multiple citations.[43] For example, the parties dispute whether plaintiffs were required to obtain a use and occupancy certificate when the tenancy of the basement of 857 Cherry Street changed; whether it was reasonable to require plaintiffs to remove the weeds from their 859 Swede Street apartment within 48 hours of the issuance of the warning; and whether defendants were justified in citing Gary Grimm multiple times for occupying condemned properties. The factfinder will have to resolve whether defendants issued these citations lawfully or whether defendants issued these citations out of retaliation. We must deny defendants' motion for summary

---

**41.** Ownership is a property interest protected by substantive due process. *See DeBlasio v. Zoning Bd. of Adjustment,* 53 F.3d 592, 600 (3d Cir.1995). In situations where the governmental conduct impinges on a landowner's use and enjoyment of property, the landowner states a substantive due process claim where he/she alleges that the government arbitrarily and capriciously interfered with that use and enjoyment. *See id.,* 53 F.3d at 601.

We note that it is Grimm Brothers, and not Gary Grimm, that has standing to raise the substantive due process claims, since Grimm Brothers owns the properties.

**42.** We stress that this Court has not decided at this point whether or not these engineers qualify as experts.

**43.** Insofar as Grimm Brothers alleges that the citations interfered with Grimm Brothers' use of the property, they state a substantive due process claim. *See supra* at footnote 41.

judgment with respect to plaintiffs' substantive due process claims unless qualified immunity protects defendants.

### d. *Analysis of Qualified Immunity Defense*

 We find that there are cases that clearly establish the substantive due process rights claimed by plaintiffs. *See, e.g., Blanche Road Corp. v. Bensalem Township*, 57 F.3d 253, 267–68 (3d Cir.1995) (holding substantive due process violation established where a plaintiff shows that officials improperly interfered with the issuance of building permits for reasons unrelated to the merits of the application for the permits); *Bello v. Walker*, 840 F.2d 1124, 1129–30 (3d Cir.1988) (holding substantive due process right established where a plaintiff shows that municipal officers improperly interfered with the process by which the municipality issued building permits, and did so for partisan political or personal reasons unrelated to the merits of the application for the permits). Defendants have failed to set forth undisputed facts showing that their conduct was reasonable. Because a factfinder could find that reasonable officials in defendants' position would not have condemned the properties and issued the citations, we will deny without prejudice defendants' motion for summary judgment with respect to plaintiffs' substantive due process claims.

### 6. *Municipal Liability*

### a. *Municipal Liability Principles*

 Under Section 1983, municipalities do not have *respondeat superior* liability for the acts of their agents. Section 1983 liability can, however, attach to the municipality where the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir.1990). "Whether a person is a policy-maker is a question of law for the judge to decide, not a fact for the jury. The court should consider state and local law and custom or usage having the force of law to determine whether a person is a policy-maker." *Russoli v. Salisbury Township*, 126 F.Supp.2d 821, 861 (E.D.Pa.2000) (internal quotations and citations omitted).

 Once a court finds that a person is a policy-maker, "it is for the jury to determine whether the policy-maker's decisions have caused the deprivation of rights at issue by policies that command that it occur or by acquiescence in a long-standing practice or custom which constitutes the standard operating procedure of the local government." *Id.* As the Third Circuit has explained,

> Policy is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict. A course of conduct is considered to be a custom when, though not authorized by law, such practices of state officials [are] so permanent and well settled as to virtually constitute law.

*Russoli*, 126 F.Supp.2d at 860 (internal quotations and citations omitted).

 A municipality can also be liable for its failure to train or supervise its employees; in order for the municipality to be liable, the failure to train must reflect a "deliberate" or "conscious" choice by the municipality. *See Russoli*, 126 F.Supp.2d at 861–62. The Third Circuit has also held that "a failure to train, discipline or control can only form the basis for Section 1983 municipal liability if the plaintiff can show both contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents and circum-

stances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate." *Id.*, 126 F.Supp.2d at 862. The Third Circuit has also applied, but not expressly adopted, a three-part test outlined by the Second Circuit: "in order for a municipality's failure to train or supervise to amount to deliberate indifference, it must be shown that (1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employee mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Id.* "Plaintiffs must also prove that the deficiency in training or supervision actually caused the police officers' indifference to the individual's constitutional rights." *Id.*

### b. *Application of Municipal Liability Principles*

■ We find that plaintiffs may not proceed on either of the bases for municipal liability. With respect to the first, policy-making theory of liability, we find as a matter of law that neither Sweeney nor O'Donnell qualifies as a policy-making official. With respect to Sweeney, the fact that he holds positions as the Fire Marshal and the Head of the Code Enforcement Department does not in itself establish his status as a policy-maker. Moreover, it is undisputed that he is being sued in his capacity as a code official. Although a code official can adopt rules and regulations, these must be for the purpose of interpreting and implementing the code enacted by the Borough. As a code official, he does not have final authority to make decisions representing municipal policy; that would be up to Borough officials.

In addition, as discussed below, all rules and regulations are subject to an administrative appeal under BOCA Code Section ES–112.1. We decline to hold that every code enforcement official is a policy-maker and can find no case extending the policy-making rule to someone at this level of government. Nor does the fact that he was one of the drafters of the Code that the Department now enforces qualify him as a policy-maker. The Borough had to have taken steps to enact the Code as an ordinance, and Sweeney's conduct in preparing a draft Code on its own does not represent municipal policy.

■ With respect to O'Donnell, his position as Assistant Building Inspector similarly does not qualify him as a policy-maker. Moreover, it is undisputed that he too is being sued in his capacity as a code official. Sweeney's testimony that code enforcement officials like O'Donnell and Sweeney have discretion to interpret and enforce the Code (C. Sweeney Dep. at 57–58) does not establish that he is a policy-making official. Undoubtedly, officials like O'Donnell have some discretion in applying the ordinances, just as police officers do. Nevertheless, the ordinances control the scope of their powers and duties. The ordinances provide that O'Donnell's and Sweeney's decisions are appealable to the appeals board created by BOCA Code Section ES–112.2 [44]; they do not have the final authority to make decisions binding the Borough and their decisions do not represent municipal policy.

Plaintiffs cannot proceed under the second, failure to train/supervise theory because they have not established two of the necessary elements, namely that: (1) the municipality had knowledge of the incidents at issue or knowledge of a prior pattern of similar incidents where a mes-

---

44. BOCA Code ES–112.2.2 provides that the board of appeals has the power to "reverse or affirm wholly or partly, or modify, the deci-

sion appealed from, and shall make such order or determination as in its opinion ought to be made."

sage of approval was communicated and (2) the deficiency in training caused the officials's indifference to plaintiffs' constitutional rights.

### C. Conspiracy Claims Under 42 U.S.C. § 1985

■ A plaintiff may state a conspiracy claim under 42 U.S.C. § 1985(3) against two or more persons who conspired to deprive that person or a class of persons of the equal protection of the laws or of equal privileges and immunities under the laws if the plaintiff establishes: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. *See Moles v. Griffy*, No. 00–2147, 2001 WL 1152984, at *4 (E.D.Pa. Sept. 18, 2001). The plaintiff must also show some racial or class-based animus behind the conspirators' actions. *See id.; Moyer v. Borough of North Wales*, No. Civ.A. 00–CV–1092, 2000 WL 1665132, at *6 (E.D.Pa. Nov. 7, 2000). Any conspiracy claim brought by plaintiffs here fails because plaintiffs have failed to put forth any evidence that defendants' motivations were racially discriminatory or class-based. Insofar as plaintiffs state a claim for conspiracy under Section 1985, we grant summary judgment in defendants' favor on this claim.

### D. Pendant State Claims

Plaintiffs have also brought state law claims against O'Donnell and Sweeney in both their official and individual capacities for the wrongful use of civil proceedings and for violations of Article I, Section 8 of the Pennsylvania Constitution. Plaintiffs' state law claims are pendant to their federal Section 1983 claims, and are properly before this Court pursuant to our power to exercise supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). We consider whether defendants are entitled to summary judgment with respect to either of these state claims.

### 1. Wrongful Use of Civil Proceedings Claim

#### a. Governmental Immunity Principles

The Pennsylvania Political Subdivision Tort Claims Act, 42 Pa. Cons.Stat. §§ 8541–64 grants governmental immunity to political subdivisions against claims for damages on account of any injury to a person or to property except for certain narrow exceptions. Under the Act, local agencies are not liable for injuries caused by their own acts or the acts of their employees that constitute "a crime, actual fraud, malice or willful misconduct," or for negligent acts unless they fall within one of eight categories.[45] 42 Pa. Cons.Stat. § 8542(a). "Local agency" means "a government unit other than the Commonwealth government." 42 Pa. Cons.Stat. § 8501. The city of Norristown is a local agency. Plaintiffs do not allege negligence within any of § 8542's enumerated categories.[46]

---

**45.** A local agency may be liable for negligent acts within the following categories: (1) vehicle liability, (2) care, custody or control of personal property, (3) real property, (4) trees, traffic controls and street lighting, (5) utility service facilities, (6) streets, (7) sidewalks and

(8) care, custody or control of animals. 42 Pa. Cons.Stat. § 8542(b).

**46.** Indeed, plaintiffs allege that defendants committed the wrongful use of civil proceedings and violated plaintiffs' rights against un-

Under the Pennsylvania Tort Claims Act, with limited exception, employees enjoy the same broad immunity that their employing agencies enjoy.[47] "An employee of a local agency is liable for civil damages on account of any injury to a person or property caused by acts of the employee which are within the scope of his office or duties only to the same extent as his employing local agency ..." 42 Pa. Cons.Stat. § 8545. An employee of a local agency may, in addition, claim the defense of official immunity whereby an employee may assert that his or her conduct "was authorized or required by law, or that [the employee] in good faith reasonably believed the conduct was authorized or required by law." 42 Pa. Cons.Stat. § 8546(2).

However, if the court determines that the employee's act constituted "a crime, actual fraud, actual malice or willful misconduct," the employee's ability to claim both the Act's overall restriction on liability and the defense of official immunity is eliminated.[48] 42 Pa. Cons.Stat. § 8550. The Pennsylvania Supreme Court has decided that at least in the context of police misconduct cases, it is improper to equate willful misconduct with the commission of an intentional tort. Instead, there must be a determination not only that the officer committed the acts in question, but that he willfully went beyond the bounds of the law. *Renk v. City of Pittsburgh*, 537 Pa.

68, 641 A.2d 289 (Pa.1994). Therefore, with respect to the wrongful use of civil proceedings tort, for example, an official may be liable only if it is found both that there was no proper basis for bringing the proceedings and that the official knew that bringing the proceedings was improper.

b. *Application of Immunity Principles*

i. *Claim Against Borough of Norristown*

As plaintiffs have conceded[49], plaintiffs' state law claim for wrongful use of civil proceedings against the Borough is barred.

ii. *Claim Against O'Donnell and Sweeney in their Official Capacities*

Because a judgment against defendants in their official capacity would impose liability on the police department and/or city, we grant summary judgment in defendants' favor on plaintiffs' state law claims brought against defendants O'Donnell and Sweeney for the same reasons as discussed *supra* at IV.D.1.b.i.

iii. *Claim Against O'Donnell and Sweeney in their Individual Capacities*

■ Although summary judgment is granted on the claims brought against the officers in their official capacity, the state law intentional tort claim brought against them in their individual capacity remain, at least initially.

reasonable searches and seizures, which are not negligent acts within any of the enumerated categories.

**47.** BOCA Code Section ES–104.2 attempts to relieve code officials from liability, however, we believe that this provision is a nullity. The Borough code does not give boroughs authority to give civil immunity to their employees and the subject has been preempted by the Commonwealth of Pennsylvania which has exclusive power in this area. Political subdivisions have only such powers as are specifically delegated to them by the legislature.

*Commonwealth v. Hanzlik*, 400 Pa. 134, 161 A.2d 340 (Pa.1960).

**48.** We note that the local agency itself does not lose its immunity from liability when an employee commits an act of willful misconduct. *Wakshul v. City of Philadelphia*, 998 F.Supp. 585, 588 (E.D.Pa.1998).

**49.** Plaintiffs indicate in their Answer to Defendants' Motion to Dismiss that they are withdrawing their state law claims as against the Borough.

We find that plaintiffs have made sufficient allegations that, if proven, and have offered sufficient evidence that, if accepted, would show that O'Donnell and Sweeney engaged in willful misconduct. Defendants, then, cannot claim the same immunity that the Borough as an entity can claim; at least as a preliminary matter, plaintiffs' tort claim survives. We analyze separately whether plaintiffs have put forth sufficient evidence to meet the elements of the tort.

42 Pa. Const.Stat. § 8351 provides:

(a) Elements of action.—A person who takes part in the procurement, initiation or continuation of civil proceedings against another is subject to liability to the other for wrongful use of civil proceedings:

(1) He acts in a grossly negligent manner or without probable cause and primarily for a purpose other than that of securing the proper discovery, joinder of parties or adjudication of the claim in which the proceedings are based; and

(2) The proceedings have terminated in favor of the person against whom they were brought.

Although it is not entirely clear from plaintiffs' papers, plaintiffs presumably contend that the "civil proceedings" were the citations that defendants issued. Arrests, criminal complaints, summonses and citations are not mentioned by the statute and we do not think that citations qualify as "civil proceedings" under the statute's terms. The Borough Code provides that "any violation or failure to comply with any provision of any Borough ordinance shall constitute a summary offense and prosecution for every such offense shall be according to the practice in the case of summary convictions." 53 P.S. § 48301.

Pennsylvania Rules of Criminal Procedure 405 and 410 make it clear that a proceeding in which a citation is issued is a criminal proceeding. In addition, Pennsylvania Rule of Criminal Procedure 103 provides that the term "penal laws" include "any ordinances which may provide for imprisonment upon conviction or failure to pay a fine or penalty." [50]

In addition, in *Pellegrino Food Products Company v. City of Warren*, 136 F.Supp.2d 391 (W.D.Pa.2000), plaintiffs alleged that the city defendants violated Pennsylvania's wrongful use of civil proceedings statute after the defendants challenged the ability of Pellegrino Foods to use for their business the parking spaces that were at issue in the case. The court noted that the challenge was effected by a letter from a zoning officer instructing plaintiffs to stop using the parking spaces. Considering whether plaintiffs had alleged a civil proceeding, the court explained that "[a] proceeding is defined in Pennsylvania as every declaration, petition or other application which may be made to a court under law or usage or under special statutory authority, but ... not an action or an appeal." *Pellegrino Food*, 136 F.Supp.2d at 406. The court also noted that following the letter, it was plaintiffs who appealed to the zoning board and then to the Court of Common Pleas. The court concluded that the letter did not qualify as a civil proceeding and dismissed the claim.

Although here the city defendants did not write a letter but issued a citation, we think that the logic of *Pellegrino Food* applies. As in *Pellegrino Food*, the citations were not declarations, petitions or applications made to a court, and it was plaintiffs who have challenged the citations.

Finding that the citations here do not qualify as civil proceedings for the purpose

---

**50.** BOCA Code Section ES–110.2 provides for a penalty of imprisonment or a monetary fine upon conviction for a violation of any provision of the BOCA Code.

of Pennsylvania's wrongful use of civil proceedings statute, we hold that defendants are entitled to summary judgment with respect to this claim.

### 2. Article I, Section 8 Claims

Plaintiffs also have brought an unreasonable search and seizure claim under Article I, Section 8 of the Pennsylvania Constitution, which provides that

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

#### a. Immunity Against Constitutional Claims

We believe that defendants [51] may not claim immunity against claims brought under the Pennsylvania Constitution. *See Warren v. Cheltenham Township*, No. Civ.A. 94–4999, 1995 WL 732804, at *6 (E.D.Pa. Nov. 13, 1995) ("section 8541 [42 Pa.C.S.A. § 8541] does not render local governments immune to actions under the constitution of Pennsylvania"); *In re PVI Assocs. v. Redevelopment Auth. of Montgomery County*, 181 B.R. 210, 215 (Bankr. E.D.Pa.1995) ("it remains true that neither the concept of sovereign nor governmental immunity is designed to insulate governmental agencies from claims arising under the State Constitution"); *Coffman v. Wilson Police Dept.*, 739 F.Supp. 257, 266 (E.D.Pa.1990) (holding that the Pennsylvania Political Subdivision Tort Claims Act provides immunity against torts only and that claims arising from violations of the Pennsylvania Constitution may still be raised against local governments); *but see Crighton v. Schuylkill County*, No. CIV.A. 94–5658, 1995 WL 113106, at *2 (E.D.Pa. Mar.14, 1995) (holding that the Pennsylvania Political Subdivision Tort Claims Act immunized county from claim arising under Pennsylvania's Equal Rights Amendment); *Agresta v. Goode*, 797 F.Supp. 399, 409 (E.D.Pa.1995) (holding that the Pennsylvania Political Subdivision Tort Claims Act barred recovery against city of Philadelphia for claims based on Pennsylvania Constitution).

#### b. Analysis of Plaintiffs' Unreasonable Search and Seizure Claims

Although the bases of plaintiffs' Article I, Section 8 claim are not entirely clear, we can glean several possible bases for this claim. First, plaintiffs appear to claim that defendants violated plaintiffs' right against unreasonable searches when they entered plaintiffs' property. However, the record shows that defendants were justified in entering the properties every time they are alleged to have entered. Either they had the occupant's consent to conduct the search or they had a warrant to search the premises. For example, when O'Donnell conducted an inspection of the basement of 857 Cherry Street, the occupant, tenant Wakefield, allowed O'Donnell to conduct the search. Likewise, when O'Donnell finally searched the entire property at 857 Cherry Street, he did so pursuant to a valid search warrant.[52] Plaintiffs might also challenge the entry into 837 Swede Street on September 20, 2000. However, insofar as plaintiffs are

---

**51.** The term "defendants" here refers only to O'Donnell and Sweeney, as plaintiffs have withdrawn both of their state law claims as against the Borough; we grant summary judgment in favor of the Borough of Norristown with respect to plaintiffs' Article I, Section 8 claim.

**52.** Plaintiffs do not appear to challenge the validity of the October 11, 2000 warrant that allowed for O'Donnell to conduct the search.

challenging the entry itself, there is no evidence that defendants O'Donnell or Sweeney entered the premises on that evening or directed the police to enter.[53] Thus, insofar as plaintiffs are challenging defendants' entering into property owned by Grimm Brothers, their claims must fail because they have failed to put forth sufficient allegations and evidence from which a factfinder could conclude that they did so unlawfully.

 Plaintiffs also appear to claim that the two condemnations constitute unreasonable seizures of property in violation of Article I, Section 8. There is a dispute as to whether the condemnations were reasonable: defendants allege that they condemned the properties because of legitimate health, safety and welfare concerns whereas plaintiffs allege that defendants condemned the properties because of retaliatory motives. This dispute of fact precludes us from granting summary judgment on plaintiffs' Article I, Section 8 claim with respect to the condemnations. Plaintiffs' Article I, Section 8 claim with respect to the condemnations must be decided by the factfinder.

 Finally, it appears that plaintiffs challenge the citations issued against Gary Grimm as unreasonable seizures in violation of Article I, Section 8. A citation can in some circumstances constitute a seizure for Fourth Amendment purposes and, we surmise, for purposes of Pennsylvania constitutional law.[54] *See Estate of Smith v. Marasco,* No. Civ. 00–CV–5485, 2002 WL 54507, at *10 (E.D.Pa. Jan. 11, 2002); *Dotson v. City of Youngstown, Ohio,* 76 F.Supp.2d 810, 814 (N.D.Ohio 1999). However, the issuance of a citation typically triggers constitutional protection only where the citation results in the individual's freedom of movement being somehow restrained. *See Estate of Smith,* 2002 WL 54507, at *10. Here, plaintiffs have offered no evidence showing that the citations in any way caused Gary Grimm's arrest or freedom of movement to be curtailed. Thus, insofar as plaintiffs rely on the citations as the basis for their Article I, Section 8 claim, we grant summary judgment in defendants' favor on this claim.

### E. Punitive Damages

### 1. Claim for Punitive Damages Under 42 U.S.C. § 1983

### a. Claim for Punitive Damages against Borough of Norristown

As noted *supra* at IV.B.6.b., there is no basis upon which the municipality may be held liable under Section 1983. Thus, plaintiffs cannot recover punitive damages from the municipality.

 Moreover, it is clear that municipal entities are immune from punitive damages under Section 1983. *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). Thus, even were the municipal subject to Section 1983 liability, such damages are not available against them. We grant

---

**53.** Plaintiffs allege that the police were summoned and broke up the NI meeting. However, plaintiffs have not named as defendants the individual police officers who disbanded the meeting. Thus, we need not consider the individual liability of these police officers. Additionally, plaintiffs have not put forth any evidence that would allow us to conclude whether the municipality ought to be held liable for this entry; they have not advanced any allegations or evidence that would show that these police officers were unreasonable in disbanding this meeting that was held in a condemned building.

**54.** We note that Article I, Section 8 has been interpreted consistent with federal decisions under the Fourth Amendment of the United States Constitution. *See Commonwealth of Pennsylvania v. Iannaccio,* 505 Pa. 414, 426 n. 4, 480 A.2d 966 (Pa.1984).

summary judgment in favor of the Borough of Norristown on plaintiffs' claim under Section 1983 for punitive damages.

### b. Claim for Punitive Damages against O'Donnell and Sweeney in their Official Capacities

 Punitive damages are also not available under Section 1983 against local officials in their official capacity. *Leipziger v. Township of Falls*, No. CIV.A. 00–1147, 2001 WL 111611, at *9 (E.D.Pa. Feb. 1, 2001). Thus, had we not granted summary judgment as to plaintiffs' claims against defendants in their official capacity, such damages would not be available against them in their official capacity. Therefore, we grant summary judgment in favor of defendants O'Donnell and Sweeney on plaintiffs' claim under Section 1983 for punitive damages against them in their official capacity.

### c. Claim for Punitive Damages Against O'Donnell and Sweeney in their Individual Capacities

 Although punitive damages are not available against the municipal entities and against the defendants in their official capacity, plaintiffs may seek punitive damages against defendants in their individual capacity. Under Section 1983, "[i]n order to obtain such damages, plaintiff must establish facts of record that prove that the individuals knowingly and maliciously deprived plaintiffs of their civil rights." *Ruiz v. Philadelphia Hous. Auth.*, No. CIV.A. 96–7853, 1998 WL 159038, at *10 (E.D.Pa. March 17, 1998). The Third Circuit has stated that

> for a plaintiff in a § 1983 case to qualify for a punitive award, the defendant's conduct must be, at a minimum, reckless or callous. Punitive damages might also be allowed if the conduct is intentional

or motivated by evil motive, but the defendant's action need not necessarily meet this higher standard.

*Savarese v. Agriss*, 883 F.2d 1194, 1204 (3d Cir.1989) (citing *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)).

We have found that plaintiffs have alleged sufficient facts, and have offered adequate supporting evidence, from which a factfinder could find that O'Donnell and Sweeney violated plaintiffs' First Amendment and Fourteenth Amendment rights when they issued the condemnation notices and citations. Should the factfinder find that defendants violated plaintiffs rights, it could justifiably find that they acted recklessly or callously. Accordingly, we deny defendants' motion for summary judgment on plaintiffs' claim for punitive damages under Section 1983 against O'Donnell and Sweeney in their individual capacities.

### 2. Claim for Punitive Damages Under State Law

 The Supreme Court of Pennsylvania has adopted the Restatement (Second) of Torts, § 908(2), which permits damages for "conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. *Rizzo v. Haines*, 520 Pa. 484, 555 A.2d 58, 69 (Pa.1989) (quoting Rest. (2d) Torts § 908(2)). The proper focus is on "the act itself together with all the circumstances including motive of the wrongdoer and the relations between the parties ..." *Id.* (citing *Chambers v. Montgomery*, 411 Pa. 339, 192 A.2d 355, 358 (1963)). Further, a court may award punitive damages only if the conduct was malicious, wanton, reckless, willful, or oppressive." *Id.* (citing *Chambers*, 411 Pa. 339, 192 A.2d at 358).

Punitive damages may be available against O'Donnell and Sweeney.[55] If the

---

**55.** We note that no state law claims against the Borough remain, so they are not suscepti-

factfinder accepts plaintiffs' allegations and the evidence they offer in support thereof, it could reasonably find that defendants were malicious in their conduct. Therefore, any state law claims that we have found must go to the factfinder on the merits should also be considered for punitive damages. We will deny defendants' motion for summary judgment as to punitive damages with respect to these claims.

## V. CONCLUSION

### A. Plaintiffs' Motion for Partial Summary Judgment

We deny Plaintiffs' Motion for Partial Summary Judgment in its entirety.

### B. Defendants' Motion for Summary Judgment

We grant in part and deny in part Defendants' Motion for Summary Judgment as follows:

#### 1. Section 1983

#### a. Claims Against O'Donnell and Sweeney in their Official Capacities

We grant partial summary judgment to Defendants O'Donnell and Sweeney with respect to all of plaintiffs' Section 1983 claims brought against them in their official capacities.

#### b. First Amendment Retaliation Claim

As for plaintiffs' First Amendment retaliation claim, we grant partial summary judgment in defendants' favor insofar as plaintiffs' claim is based a claim that defendants' actions denied them access to the courts because plaintiffs have not shown that defendants' conduct deterred them from seeking relief in court.

With respect to the First Amendment retaliation claim, we also grant partial summary judgment in defendants' favor insofar as plaintiffs allege that the protected activity is refusing to allow O'Donnell to search Grimm Brothers' property; plaintiffs may, however, pursue their retaliation claim based on the refusal of access independent of their First Amendment retaliation claim.

Insofar as plaintiffs allege their participation in NAIL and NI and the filing of lawsuits as the activities protected by the First Amendment right against retaliation and insofar as plaintiffs are alleging a retaliation claim (as opposed to an interference with the right of access to the courts claim), we deny defendants' motion for summary judgment.[56]

With respect to the First Amendment retaliation claim, we deny without prejudice defendants' motion for summary judgment based on their asserted qualified immunity defense.

#### c. Substantive Due Process Claim

We deny defendants' motion for summary judgment with respect to plaintiffs' substantive due process claim. We deny without prejudice defendants' motion for summary judgment based on their asserted qualified immunity defense with respect to plaintiffs' substantive due process claim.

#### d. Municipal Liability

We grant partial summary judgment to defendants with respect to plaintiffs' claim that the Borough ought to be held liable under Section 1983; both (1) plaintiffs' pol-

---

ble to punitive damages under state law.

**56.** This denial of defendants' motion for summary judgment applies to all of defendants'

conduct that plaintiffs allege was taken in retaliation, both issuing condemnations and multiple citations.

icy-making theory of municipal liability and (2) plaintiffs' failure to train or supervise theory of liability fail.

### 2. Section 1985 Conspiracy Claim

We grant partial summary judgment in defendants' favor on plaintiffs' Section 1985 conspiracy claim.

### 3. Pendant State Claims

#### a. Wrongful Use of Civil Proceedings Claim

We grant partial summary judgment in favor of the Borough and in favor of O'Donnell and Sweeney, in both their official and individual capacities, with respect to plaintiffs' state law wrongful use of civil proceedings claim.

#### b. Article I, Section 8 Claim

We grant summary judgment in favor of the Borough with respect to plaintiffs' state law claim based on Article I, Section 8 of the Pennsylvania Constitution.

We grant partial summary judgment in favor of O'Donnell and Sweeney on plaintiffs' Article I, Section 8 claim insofar as plaintiffs challenge (1) entries made by defendants onto and into plaintiffs' properties and (2) defendants' issuance of citations against plaintiffs.

We deny defendants' motion for summary judgment with respect to plaintiffs' Article I, Section 8 claim insofar as plaintiffs challenge the condemnations of 857 Cherry Street and 837 Swede Street.

### 4. Punitive Damages

We grant partial summary judgment in defendants' favor on plaintiffs' claim for punitive damages under Section 1983 brought against the Borough and O'Donnell and Sweeney in their official capacities. Plaintiffs may seek punitive damages under Section 1983 against O'Donnell and Sweeney in their individual capacities.

Plaintiffs may seek punitive damages against O'Donnell and Sweeney under state law.